# WHITE *v.* ILLINOIS

No. 90–6113. Argued November 5, 1991—Decided January 15, 1992

Rehnquist, C. J., delivered the opinion of the Court, in which White, Blackmun, Stevens, O'Connor, Kennedy, and Souter, JJ., joined, and in which Scalia and Thomas, JJ., joined except for the discussion rejecting the United States' proposed reading of the "witness against" Confrontation Clause phrase. Thomas, J., filed an opinion concurring in part and concurring in the judgment, in which Scalia, J., joined, *post*, p. 358.

*Gary R. Peterson* argued the cause for petitioner. With him on the briefs was *Daniel D. Yuhas.*

*Arleen C. Anderson* argued the cause for respondent. With her on the brief were *Roland W. Burris, Rosalyn B. Kaplan, Terence M. Madsen,* and *Douglas C. Smith.*

*Stephen L. Nightingale* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller,* and *Deputy Solicitor General Bryson.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In this case, we consider whether the Confrontation Clause of the Sixth Amendment requires that, before a trial court admits testimony under the "spontaneous declaration" and "medical examination" exceptions to the hearsay rule,

---

*Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Arnold O. Overoye,* Senior Assistant Attorney General, and *Karen L. Ziskind, Janet E. Neeley,* and *Janet G. Bangle,* Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Charles E. Cole* of Alaska, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Larry EchoHawk* of Idaho, *Bonnie Campbell* of Iowa, *Robert T. Stephan* of Kansas, *Fred Cowan* of Kentucky, *Michael E. Carpenter* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Marc Racicot* of Montana, *Frankie Sue Del Papa* of Nevada, *John P. Arnold* of New Hampshire, *Robert J. Del Tufo* of New Jersey, *Lee Fisher* of Ohio, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, *Mary Sue Terry* of Virginia, *Mario J. Palumbo* of West Virginia, and *Joseph B. Meyer* of Wyoming; for the City of New York by *Victor A. Kovner, Leonard J. Koerner,* and *Elizabeth S. Natrella;* for the New York Society for the Prevention of Cruelty to Children by *John P. Hale;* and for the Victim Assistance Centre, Inc., et al. by *David Crump.*

*Natman Schaye* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae.*

the prosecution must either produce the declarant at trial or the trial court must find that the declarant is unavailable. The Illinois Appellate Court concluded that such procedures are not constitutionally required. We agree with that conclusion.

Petitioner was convicted by a jury of aggravated criminal sexual assault, residential burglary, and unlawful restraint. Ill. Rev. Stat., ch. 38, ¶¶ 12–14, 19–3, 10–3 (1989). The events giving rise to the charges related to the sexual assault of S. G., then four years old. Testimony at the trial established that in the early morning hours of April 16, 1988, S. G.'s babysitter, Tony DeVore, was awakened by S. G.'s scream. DeVore went to S. G.'s bedroom and witnessed petitioner leaving the room, and petitioner then left the house. 6 Tr. 10–11. DeVore knew petitioner because petitioner was a friend of S. G.'s mother, Tammy Grigsby. *Id.,* at 27. DeVore asked S. G. what had happened. According to DeVore's trial testimony, S. G. stated that petitioner had put his hand over her mouth, choked her, threatened to whip her if she screamed and had "touch[ed] her in the wrong places." Asked by DeVore to point to where she had been touched, S. G. identified the vaginal area. *Id.,* at 12–17.

Tammy Grigsby, S. G.'s mother, returned home about 30 minutes later. Grigsby testified that her daughter appeared "scared" and a "little hyper." *Id.,* at 77–78. Grigsby proceeded to question her daughter about what had happened. At trial, Grigsby testified that S. G. repeated her claims that petitioner had choked and threatened her. Grigsby also testified that S. G. stated that petitioner had "put his mouth on her front part." *Id.,* at 79. Grigsby also noticed that S. G. had bruises and red marks on her neck that had not been there previously. *Id.,* at 81. Grigsby called the police.

Officer Terry Lewis arrived a few minutes later, roughly 45 minutes after S. G.'s scream had first awakened DeVore. Lewis questioned S. G. alone in the kitchen. At trial, Lewis'

summary of S. G.'s statement indicated that she had offered essentially the same story as she had first reported to De-Vore and to Grigsby, including a statement that petitioner had "used his tongue on her in her private parts." *Id.*, at 110–112.

After Lewis concluded his investigation, and approximately four hours after DeVore first heard S. G.'s scream, S. G. was taken to the hospital. She was examined first by Cheryl Reents, an emergency room nurse, and then by Dr. Michael Meinzen. Each testified at trial, and their testimony indicated that, in response to questioning, S. G. again provided an account of events that was essentially identical to the one she had given to DeVore, Grigsby, and Lewis.

S. G. never testified at petitioner's trial. The State attempted on two occasions to call her as a witness, but she apparently experienced emotional difficulty on being brought to the courtroom and in each instance left without testifying. App. 14. The defense made no attempt to call S. G. as a witness, and the trial court neither made, nor was asked to make, a finding that S. G. was unavailable to testify. 6 Tr. 105–106.

Petitioner objected on hearsay grounds to DeVore, Grigsby, Lewis, Reents, and Meinzen being permitted to testify regarding S. G.'s statements describing the assault. The trial court overruled each objection. With respect to DeVore, Grigsby, and Lewis the trial court concluded that the testimony could be permitted pursuant to an Illinois hearsay exception for spontaneous declarations.[1] Petitioner's objections to Reents' and Meinzen's testimony was similarly overruled, based on both the spontaneous declaration exception and an exception for statements made in the

---

[1] The spontaneous declaration exception applies to "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." 198 Ill. App. 3d 641, 648, 555 N. E. 2d 1241, 1246 (1990).

course of securing medical treatment.[2] The trial court also denied petitioner's motion for a mistrial based on S. G.'s "presence [and] failure to testify." App. 14.

Petitioner was found guilty by a jury, and the Illinois Appellate Court affirmed his conviction. It held that the trial court operated within the discretion accorded it under state law in ruling that the statements offered by DeVore, Grigsby, and Lewis qualified for the spontaneous declaration exception and in ruling that the statements offered by Reents and Meinzen qualified for the medical examination exception. 198 Ill. App. 3d 641, 648–656, 555 N. E. 2d 1241, 1246–1251 (1990). The court then went on to reject petitioner's Confrontation Clause[3] challenge, a challenge based principally on language contained in this Court's decision in *Ohio* v. *Roberts*, 448 U. S. 56 (1980). It concluded that our later decision in *United States* v. *Inadi*, 475 U. S. 387 (1986), foreclosed any rule requiring that, as a necessary antecedent to the introduction of hearsay testimony, the prosecution must either produce the declarant at trial or show that the declarant is unavailable. The Illinois Supreme Court denied discretionary review, and we granted certiorari, 500 U. S. 904 (1991), limited to the constitutional question whether permitting the challenged testimony violated petitioner's Sixth Amendment Confrontation Clause right.[4]

---

[2] Illinois Rev. Stat., ch. 38, ¶ 115–13 (1989), provides:

"In a prosecution for violation of Section 12–13, 12–14, 12–15 or 12–16 of the 'Criminal Code of 1961', statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule."

[3] "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." U. S. Const., Amdt. 6.

[4] We take as a given, therefore, that the testimony properly falls within the relevant hearsay exceptions.

We consider as a preliminary matter an argument not considered below but urged by the United States as *amicus curiae* in support of respondent. The United States contends that petitioner's Confrontation Clause claim should be rejected because the Confrontation Clause's limited purpose is to prevent a particular abuse common in 16th- and 17th-century England: prosecuting a defendant through the presentation of *ex parte* affidavits, without the affiants ever being produced at trial. Because S. G.'s out-of-court statements do not fit this description, the United States suggests that S. G. was not a "witness against" petitioner within the meaning of the Clause. The United States urges this position, apparently in order that we might further conclude that the Confrontation Clause generally does not apply to the introduction of out-of-court statements admitted under an accepted hearsay exception. The only situation in which the Confrontation Clause would apply to such an exception, it argues, would be those few cases where the statement sought to be admitted was in the character of an *ex parte* affidavit, *i. e.*, where the circumstances surrounding the out-of-court statement's utterance suggest that the statement has been made for the principal purpose of accusing or incriminating the defendant.

Such a narrow reading of the Confrontation Clause, which would virtually eliminate its role in restricting the admission of hearsay testimony, is foreclosed by our prior cases. The discussions in these cases, going back at least as far as *Mattox* v. *United States*, 156 U. S. 237 (1895), have included historical examination of the origins of the Confrontation Clause and of the state of the law of evidence existing at the time the Sixth Amendment was adopted and later. We have been careful "not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements." *Idaho* v. *Wright*, 497 U. S. 805, 814 (1990) (citations omitted). Nonetheless, we have consistently sought to "stee[r] a middle course," *Roberts, supra*, at

68, n. 9, that recognizes that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," *California* v. *Green,* 399 U. S. 149, 155 (1970), and "stem from the same roots," *Dutton* v. *Evans,* 400 U. S. 74, 86 (1970). In *Mattox* itself, upon which the Government relies, the Court allowed the recorded testimony of a witness at a prior trial to be admitted. But, in the Court's view, the result was justified not because the hearsay testimony was unlike an *ex parte* affidavit, but because it came within an established exception to the hearsay rule. We think that the argument presented by the Government comes too late in the day to warrant reexamination of this approach.[5]

We therefore now turn to petitioner's principal contention that our prior decision in *Roberts* requires that his conviction be vacated. In *Roberts* we considered a Confrontation Clause challenge to the introduction at trial of a transcript containing testimony from a probable-cause hearing, where the transcript included testimony from a witness not produced at trial but who had been subject to examination by defendant's counsel at the probable-cause hearing. In the course of rejecting the Confrontation Clause claim in that case, we used language that might suggest that the Confrontation Clause generally requires that a declarant either be produced at trial or be found unavailable before his out-of-court statement may be admitted into evidence. However, we think such an expansive reading of the Clause is negated by our subsequent decision in *Inadi, supra.*

In *Inadi* we considered the admission of out-of-court statements made by a co-conspirator in the course of the conspiracy. As an initial matter, we rejected the proposition that *Roberts* established a rule that "no out-of-court statement would be admissible without a showing of unavailability."

---

[5] We note also that the position now advanced by the United States has been previously considered by this Court but gained the support of only a single Justice. See *Dutton* v. *Evans,* 400 U. S. 74, 93–100 (1970) (Harlan, J., concurring in result).

475 U. S., at 392. To the contrary, rather than establishing "a wholesale revision of the law of evidence" under the guise of the Confrontation Clause, *ibid.*, we concluded that "*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts," *id.*, at 394. So understood, *Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding. *Ibid.*

Having clarified the scope of *Roberts*, the Court in *Inadi* then went on to reject the Confrontation Clause challenge presented there. In particular, we refused to extend the unavailability requirement established in *Roberts* to all out-of-court statements. Our decision rested on two factors. First, unlike former in-court testimony, co-conspirator statements "provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court," *Inadi*, 475 U. S., at 395. Also, given a declarant's likely change in status by the time the trial occurs, simply calling the declarant in the hope of having him repeat his prior out-of-court statements is a poor substitute for the full evidentiary significance that flows from statements made when the conspiracy is operating in full force. *Ibid.*

Second, we observed that there is little benefit, if any, to be accomplished by imposing an "unavailability rule."[6] Such a rule will not work to bar absolutely the introduction of the out-of-court statements; if the declarant either is unavailable, or is available and produced for trial, the statements can be introduced. *Id.*, at 396. Nor is an unavailability rule likely to produce much testimony that adds meaningfully to the trial's truth-determining process. *Ibid.*

---

[6] By "unavailability rule," we mean a rule which would require as a predicate for introducing hearsay testimony either a showing of the declarant's unavailability or production at trial of the declarant.

Many declarants will be subpoenaed by the prosecution or defense, regardless of any Confrontation Clause requirement, while the Compulsory Process Clause[7] and evidentiary rules permitting a defendant to treat witnesses as hostile will aid defendants in obtaining a declarant's live testimony. *Id.*, at 396–398. And while an unavailability rule would therefore do little to improve the accuracy of factfinding, it is likely to impose substantial additional burdens on the fact-finding process. The prosecution would be required to repeatedly locate and keep continuously available each declarant, even when neither the prosecution nor the defense has any interest in calling the witness to the stand. An additional inquiry would be injected into the question of admissibility of evidence, to be litigated both at trial and on appeal. *Id.*, at 398–399.

These observations, although expressed in the context of evaluating co-conspirator statements, apply with full force to the case at hand. We note first that the evidentiary rationale for permitting hearsay testimony regarding spontaneous declarations and statements made in the course of receiving medical care is that such out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness.[8] But those same factors that contribute to

---

[7] "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U. S. Const., Amdt. 6.

[8] Indeed, it is this factor that has led us to conclude that "firmly rooted" exceptions carry sufficient indicia of reliability to satisfy the reliability requirement posed by the Confrontation Clause. See *Idaho* v. *Wright*, 497 U. S. 805, 817, 820–821 (1990); *Bourjaily* v. *United States*, 483 U. S. 171, 182–184 (1987). There can be no doubt that the two exceptions we consider in this case are "firmly rooted." The exception for spontaneous declarations is at least two centuries old, see 6 J. Wigmore, Evidence § 1747, p. 195 (J. Chadbourn rev. 1976), and may date to the late 17th century. See *Thompson* v. *Trevanion*, 90 Eng. Rep. 179 (K. B. 1694). It is currently recognized under Federal Rule of Evidence 803(2), and in nearly four-fifths of the States. See Brief for State of California et al. as *Amici Curiae* 15–16, n. 4 (collecting state statutes and cases). The exception

the statements' reliability cannot be recaptured even by later in-court testimony. A statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom. Similarly, a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony. They are thus materially different from the statements at issue in *Roberts*, where the out-of-court statements sought to be introduced were themselves made in the course of a judicial proceeding, and where there was consequently no threat of lost evidentiary value if the out-of-court statements were replaced with live testimony.

The preference for live testimony in the case of statements like those offered in *Roberts* is because of the importance of cross-examination, "the greatest legal engine ever invented for the discovery of truth." *Green*, 399 U. S., at 158. Thus courts have adopted the general rule prohibiting the receipt of hearsay evidence. But where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.

We therefore think it clear that the out-of-court statements admitted in this case had substantial probative value, value that could not be duplicated simply by the declarant later testifying in court. To exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the

---

for statements made for purposes of medical diagnosis or treatment is similarly recognized in Federal Rule of Evidence 803(4), and is equally widely accepted among the States. See Brief for State of California et al. as *Amici Curiae* 31–32, n. 13 (same).

" 'integrity of the factfinding process.' " *Coy* v. *Iowa,* 487 U. S. 1012, 1020 (1988) (quoting *Kentucky* v. *Stincer,* 482 U. S. 730, 736 (1987)). And as we have also noted, a statement that qualifies for admission under a "firmly rooted" hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability. *Wright,* 497 U. S., at 820–821. Given the evidentiary value of such statements, their reliability, and that establishing a generally applicable unavailability rule would have few practical benefits while imposing pointless litigation costs, we see no reason to treat the out-of-court statements in this case differently from those we found admissible in *Inadi.* A contrary rule would result in exactly the kind of "wholesale revision" of the laws of evidence that we expressly disavowed in *Inadi.* We therefore see no basis in *Roberts* or *Inadi* for excluding from trial, under the aegis of the Confrontation Clause, evidence embraced within such exceptions to the hearsay rule as those for spontaneous declarations and statements made for medical treatment.

As a second line of argument, petitioner presses upon us two recent decisions involving child testimony in child-sexual-assault cases, *Coy* v. *Iowa, supra,* and *Maryland* v. *Craig,* 497 U. S. 836 (1990). Both *Coy* and *Craig* required us to consider the constitutionality of courtroom procedures designed to prevent a child witness from having to face across an open courtroom a defendant charged with sexually assaulting the child. In *Coy* we vacated a conviction that resulted from a trial in which a child witness testified from behind a screen, and in which there had been no particularized showing that such a procedure was necessary to avert a risk of harm to the child. In *Craig* we upheld a conviction that resulted from a trial in which a child witness testified via closed circuit television after such a showing of necessity. Petitioner draws from these two cases a general rule that hearsay testimony offered by a child should be permitted only upon a showing of necessity—*i. e.,* in cases where neces-

sary to protect the child's physical and psychological well-being.

Petitioner's reliance is misplaced. *Coy* and *Craig* involved only the question of what *in-court* procedures are constitutionally required to guarantee a defendant's confrontation right once a witness is testifying. Such a question is quite separate from that of what requirements the Confrontation Clause imposes as a predicate for the introduction of out-of-court declarations. *Coy* and *Craig* did not speak to the latter question. As we recognized in *Coy*, the admissibility of hearsay statements raises concerns lying at the periphery of those that the Confrontation Clause is designed to address, 487 U. S., at 1016. There is thus no basis for importing the "necessity requirement" announced in those cases into the much different context of out-of-court declarations admitted under established exceptions to the hearsay rule.

For the foregoing reasons, the judgment of the Illinois Appellate Court is

*Affirmed.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

The Court reaches the correct result under our precedents. I write separately only to suggest that our Confrontation Clause jurisprudence has evolved in a manner that is perhaps inconsistent with the text and history of the Clause itself. The Court unnecessarily rejects, in dicta, the United States' suggestion that the Confrontation Clause in general may not regulate the admission of hearsay evidence. See *ante*, at 352–353. The truth may be that this Court's cases unnecessarily have complicated and confused the relationship between the constitutional right of confrontation and the hearsay rules of evidence.

The Confrontation Clause provides simply that "[i]n all criminal prosecutions, the accused shall enjoy the right . . .

to be confronted with the witnesses against him . . . ." U. S. Const., Amdt. 6. It is plain that the critical phrase within the Clause for purposes of this case is "witnesses against him." Any attempt at unraveling and understanding the relationship between the Clause and the hearsay rules must begin with an analysis of the meaning of that phrase. Unfortunately, in recent cases in this area, the Court has *assumed* that *all* hearsay declarants are "witnesses against" a defendant within the meaning of the Clause, see, *e. g., Ohio* v. *Roberts,* 448 U. S. 56 (1980); *Lee* v. *Illinois,* 476 U. S. 530 (1986); *Idaho* v. *Wright,* 497 U. S. 805 (1990), an assumption that is neither warranted nor supported by the history or text of the Confrontation Clause.

There is virtually no evidence of what the drafters of the Confrontation Clause intended it to mean. See *California* v. *Green,* 399 U. S. 149, 176, n. 8 (1970) (Harlan, J., concurring); *Dutton* v. *Evans,* 400 U. S. 74, 95 (1970) (Harlan, J., concurring in result); Baker, The Right to Confrontation, The Hearsay Rules, and Due Process—A Proposal for Determining When Hearsay May be Used in Criminal Trials, 6 Conn. L. Rev. 529, 532 (1974). The strictest reading would be to construe the phrase "witnesses against him" to confer on a defendant the right to confront and cross-examine only those witnesses who actually appear and testify at trial. This was Wigmore's view:

> "The net result, then, under the constitutional rule, is that, so far as testimony is required under the hearsay rule to be taken infrajudicially, *it shall be taken in a certain way,* namely, subject to cross-examination—not secretly or ex parte away from the accused. The Constitution does not prescribe what kinds of testimonial statements (dying declarations or the like) shall be given infrajudicially—this depends on the law of evidence for the time being—but only what mode of procedure shall be followed—i. e., a cross-examining procedure—in the case of such testimony as is required by the ordinary law

of evidence to be given infrajudicially." 5 J. Wigmore, Evidence § 1397, p. 159 (J. Chadbourn rev. 1974) (footnote omitted; emphasis modified).

The Wigmore view was endorsed by Justice Harlan in his opinion concurring in the result in *Dutton* v. *Evans, supra,* at 94. It also finds support in the plain language of the Clause. As JUSTICE SCALIA recently observed:

"The Sixth Amendment does not literally contain a prohibition upon [hearsay] evidence, since it guarantees the defendant only the right to confront the 'witnesses against him.' As applied in the Sixth Amendment's context of a prosecution, the noun 'witness'—in 1791 as today—could mean either (a) one 'who knows or sees any thing; one personally present' or (b) 'one who gives testimony' or who 'testifies,' *i. e.,* '[i]n *judicial proceedings,* [one who] make[s] a solemn declaration under oath, for the purpose of establishing or making proof of some fact to a court.' 2 N. Webster, An American Dictionary of the English Language (1828) (emphasis added). See also J. Buchanan, Linguae Britannicae Vera Pronunciatio (1757). The former meaning (one 'who knows or sees') would cover hearsay evidence, but is excluded in the Sixth Amendment by the words following the noun: 'witnesses *against him.*' The phrase obviously refers to those who give testimony against the defendant at trial." *Maryland* v. *Craig,* 497 U. S. 836, 864–865 (1990) (dissenting opinion).

The difficulty with the Wigmore-Harlan view in its purest form is its tension with much of the apparent history surrounding the evolution of the right of confrontation at common law and with a long line of this Court's precedent, discussed below. For those reasons, the pure Wigmore-Harlan reading may be an improper construction of the Confrontation Clause.

Relevant historical sources and our own earlier decisions, nonetheless, suggest that a narrower reading of the Clause than the one given to it since 1980 may well be correct. In 16th-century England, magistrates interrogated the prisoner, accomplices, and others prior to trial. These interrogations were "intended only for the information of the court. The prisoner had no right to be, and probably never was, present." 1 J. Stephen, A History of the Criminal Law of England 221 (1883). At the trial itself, "proof was usually given by reading depositions, confessions of accomplices, letters, and the like; and this occasioned frequent demands by the prisoner to have his 'accusers,' *i. e.*, the witnesses against him, brought before him face to face . . . ." *Id.*, at 326. See also 5 Wigmore, *supra*, § 1364, at 13 ("[T]here was . . . no appreciation at all of the necessity of calling a person to the stand as a witness"; rather, it was common practice to obtain "information by consulting informed persons not called into court"); 9 W. Holdsworth, History of English Law 227–229 (3d ed. 1944). The infamous trial of Sir Walter Raleigh on charges of treason in 1603 in which the Crown's primary evidence against him was the confession of an alleged co-conspirator (the confession was repudiated before trial and probably had been obtained by torture) is a well-known example of this feature of English criminal procedure. See Pollitt, The Right of Confrontation: Its History and Modern Dress, 8 J. Pub. L. 381, 388–389 (1959); 1 Stephen, *supra*, at 333–336; 9 Holdsworth, *supra*, at 216–217, 226–228.

Apparently in response to such abuses, a common-law right of confrontation began to develop in England during the late 16th and early 17th centuries. 5 Wigmore, *supra*, § 1364, at 23; Pollitt, *supra*, at 389–390. Justice Story believed that the Sixth Amendment codified some of this common law, 3 J. Story, Commentaries on the Constitution of the United States 662 (1833), and this Court previously has recognized the common-law origins of the right, see *Salinger* v. *United States*, 272 U. S. 542, 548 (1926) ("The right of con-

frontation did not originate with the provision in the Sixth Amendment, but was a common-law right having recognized exceptions"). The Court consistently has indicated that the primary purpose of the Clause was to prevent the abuses that had occurred in England. See *Mattox* v. *United States*, 156 U. S. 237, 242 (1895) ("The primary object of the [Confrontation Clause] was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness . . ."); *California* v. *Green*, 399 U. S., at 156 ("It is sufficient to note that the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on 'evidence' which consisted solely of *ex parte* affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact"); *id.*, at 179 (Harlan, J., concurring) ("From the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses"); *Dutton* v. *Evans*, 400 U. S., at 94 (Harlan, J., concurring in result) (the "paradigmatic evil the Confrontation Clause was aimed at" was "trial by affidavit").

There appears to be little if any indication in the historical record that the exceptions to the hearsay rule were understood to be limited by the simultaneously evolving common-law right of confrontation. The Court has never explored the historical evidence on this point.[1] As a matter of plain

---

[1] The only recent decision to address this question explicitly was *Ohio* v. *Roberts*, 448 U. S. 56 (1980), in which the Court simply stated that "[t]he historical evidence leaves little doubt, however, that the Clause was intended to exclude some hearsay," *id.*, at 63 (citing *California* v. *Green*, 399 U. S. 149, 156–157 (1970)). The cited passage in *Green* simply reiterates the previously noted point that the right of confrontation evolved as a response to the problem of trial by affidavit. Thus, the statement in *Roberts* that "the Clause was intended to exclude *some* hearsay" is correct as far as it goes (affidavits and depositions are hearsay), but the opinion

language, however, it is difficult to see how or why the Clause should apply to hearsay evidence as a general proposition. As Justice Harlan observed:

> "If one were to translate the Confrontation Clause into language in more common use today, it would read: 'In all criminal prosecutions, the accused shall enjoy the right to be present and to cross-examine the witnesses against him.' Nothing in this language or in its 18th-century equivalent would connote a purpose to control the scope of the rules of evidence. The language is particularly ill-chosen if what was intended was a prohibition on the use of any hearsay . . . ." *Id.,* at 95 (opinion concurring in result).

The standards that the Court has developed to implement its assumption that the Confrontation Clause limits admission of hearsay evidence have no basis in the text of the Sixth Amendment. Ever since *Ohio* v. *Roberts,* 448 U. S. 56 (1980), the Court has interpreted the Clause to mean that hearsay may be admitted only under a "firmly rooted" exception, *id.,* at 66, or if it otherwise bears "particularized guarantees of trustworthiness," *ibid.* See, *e. g., Idaho* v. *Wright,* 497 U. S., at 816; *Bourjaily* v. *United States,* 483 U. S. 171, 183 (1987). This analysis implies that the Confrontation Clause bars only unreliable hearsay. Although the historical concern with trial by affidavit and anonymous accusers does reflect concern with the reliability of the evidence against a defendant, the Clause makes no distinction based on the reliability of the evidence presented. Nor does it seem likely that the drafters of the Sixth Amendment intended to permit a defendant to be tried on the basis of *ex parte* affidavits found to be reliable. Cf. U. S. Const., Art. III, § 3 ("No Person shall be convicted of Treason unless on the testimony of two Witnesses to the same overt Act, or on Confession in open court"). Reliability is more properly a due

---

should not be read as having established that the drafters intended the Clause to encompass *all* hearsay, or even hearsay in general.

process concern. There is no reason to strain the text of the Confrontation Clause to provide criminal defendants with a protection that due process already provides them.

The United States, as *amicus curiae,* has suggested that the Confrontation Clause should apply only to those persons who provide in-court testimony or the functional equivalent, such as affidavits, depositions, or confessions that are made in contemplation of legal proceedings. This interpretation is in some ways more consistent with the text and history of the Clause than our current jurisprudence, and it is largely consistent with our cases. If not carefully formulated, however, this approach might be difficult to apply and might develop in a manner not entirely consistent with the crucial "witnesses against him" phrase.

In this case, for example, the victim's statements to the investigating police officer might be considered the functional equivalent of in-court testimony because the statements arguably were made in contemplation of legal proceedings. Attempts to draw a line between statements made in contemplation of legal proceedings and those not so made would entangle the courts in a multitude of difficulties. Few types of statements could be categorically characterized as within or without the reach of a defendant's confrontation rights. Not even statements made to the police or government officials could be deemed automatically subject to the right of confrontation (imagine a victim who blurts out an accusation to a passing police officer, or the unsuspecting social-services worker who is told of possible child abuse). It is also not clear under the United States' approach whether the declarant or the listener (or both) must be contemplating legal proceedings. The United States devotes little attention to the application of its proposed standard in this case.

Thus, we are faced with a situation in which the text of the Sixth Amendment supports the Wigmore-Harlan view but history and our earlier cases point away from that strict-

est reading of the text. Despite this tension, I believe it is possible to interpret the Confrontation Clause along the lines suggested by the United States in a manner that is faithful to both the provision's text and history. One possible formulation is as follows: The federal constitutional right of confrontation extends to any witness who actually testifies at trial, but the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions. It was this discrete category of testimonial materials that was historically abused by prosecutors as a means of depriving criminal defendants of the benefit of the adversary process, see, *e. g., Mattox* v. *United States*, 156 U. S., at 242–243, and under this approach, the Confrontation Clause would not be construed to extend beyond the historical evil to which it was directed.

Such an approach would be consistent with the vast majority of our cases, since virtually all of them decided before *Ohio* v. *Roberts* involved prior testimony or confessions,[2] exactly the type of formalized testimonial evidence that lies at the core of the Confrontation Clause's concern. This narrower reading of the Confrontation Clause would greatly simplify the inquiry in the hearsay context. Furthermore, this interpretation would avoid the problem posed by the

---

[2] See, *e. g., Reynolds* v. *United States*, 98 U. S. 145, 158–161 (1879) (testimony at prior trial); *Mattox* v. *United States*, 156 U. S. 237, 240–244 (1895) (same); *Motes* v. *United States*, 178 U. S. 458, 471–474 (1900) (testimony at "preliminary trial"); *Pointer* v. *Texas*, 380 U. S. 400, 406–408 (1965) (preliminary hearing testimony); *Douglas* v. *Alabama*, 380 U. S. 415, 418–420 (1965) (codefendant's confession); *Brookhart* v. *Janis*, 384 U. S. 1, 4 (1966) (same); *Barber* v. *Page*, 390 U. S. 719, 722–725 (1968) (preliminary hearing testimony); *Bruton* v. *United States*, 391 U. S. 123, 126–128, and n. 3 (1968) (codefendant's confession); *Roberts* v. *Russell*, 392 U. S. 293, 294–295 (1968) *(per curiam)* (same); *Berger* v. *California*, 393 U. S. 314, 314–315 (1969) *(per curiam)* (preliminary hearing testimony); *California* v. *Green*, 399 U. S., at 152 (preliminary hearing testimony and statement to police); *Mancusi* v. *Stubbs*, 408 U. S. 204, 213–216 (1972) (prior testimony).

Court's current focus on hearsay exceptions that are "firmly rooted" in the common law. See *ante*, at 355–356, n. 8. The Court has never explained the Confrontation Clause implications of a State's decision to adopt an exception not recognized at common law or one not recognized by a majority of the States. Our current jurisprudence suggests that, in order to satisfy the Sixth Amendment, the State would have to establish in each individual case that hearsay admitted pursuant to the newly created exception bears "particularized guarantees of trustworthiness," and would have to continue doing so until the exception became "firmly rooted" in the common law, if that is even possible under the Court's standard. This result is difficult to square with the Clause itself. Neither the language of the Clause nor the historical evidence appears to support the notion that the Confrontation Clause was intended to constitutionalize the hearsay rule and its exceptions. Although the Court repeatedly has disavowed any intent to cause that result, see, *e. g., ante*, at 352; *Idaho* v. *Wright*, 497 U. S., at 814; *United States* v. *Inadi*, 475 U. S. 387, 393, n. 5 (1986); *Dutton* v. *Evans*, 400 U. S., at 86; *California* v. *Green*, 399 U. S., at 155, I fear that our decisions have edged ever further in that direction.

For the foregoing reasons, I respectfully suggest that, in an appropriate case, we reconsider how the phrase "witness against" in the Confrontation Clause pertains to the admission of hearsay. I join the Court's opinion except for its discussion of the narrow reading of this phrase proposed by the United States.