STATE of Wisconsin, Plaintiff-Respondent,

v.

Ernestine HICKMAN, Defendant-Appellant.†

Court of Appeals

*No. 93–0713–CR. Oral argument December 16, 1993.—Decided February 9, 1994.*

(Also reported in 513 N.W.2d 657.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ann T. Bowe* of Milwaukee. There was oral argument by *Ann T. Bowe*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *William C. Wolford*, assistant attorney general. There was oral argument by *William C. Wolford*.

Before Brown, Nettesheim and Snyder, JJ.

BROWN, J. This is Ernestine Hickman's appeal from a judgment convicting her of first-degree intentional homicide as a party to a crime. A jury found her guilty of conspiracy in murdering her husband, John Hickman. The sole issue is whether the trial court misused its discretion in allowing the testimony of unavailable coactor Ronnie Nicholson from his own prior trial as part of the State's case against Ernestine. Because it was proper to admit the former testimony under § 908.045, STATS., and because Ernestine's confrontation rights were not violated, we affirm.

Although the record is voluminous, coactor Nicholson's confession provides the historical background in a light most favorable to the verdict. The confession informed the jury that: Ernestine approached Nicholson's brother, Tracy, and offered him $500 to kill her

husband. The next day, Bud. Walker, Nicholson's cousin, took Nicholson over to Walker's house. There, Nicholson met Ernestine who said that she had talked with Tracy about murdering her husband. Nicholson asked Ernestine if Tracy had agreed and Ernestine replied, "no." Ernestine asked Nicholson if he would do it and Nicholson declined. Nicholson asked her why she wanted her husband killed, and Ernestine replied that her husband beat her and threatened to kill her; she also mentioned something about getting all the insurance money. Later that evening, while at Walker's house, she reiterated her wish to "get this thing done."

Ernestine eventually left to go home and, subsequently, Walker and Nicholson went over to Ernestine's house and parked the car in an alley nearby. Walker had a key for the back door; he unlocked it and both entered. Ernestine was in the kitchen and, after Walker and Nicholson entered, Walker and Ernestine met privately and whispered back and forth. Nicholson overheard Ernestine saying she wanted to "get it done" and also heard Walker reply that he would take care of it and that Ernestine would not have to worry about her husband anymore. That is when Nicholson knew that Walker was going to kill Ernestine's husband and that it was "going to happen then."

Walker tiptoed down the basement stairs and Nicholson followed behind him. When Walker got to the bottom of the stairs, Nicholson noticed that Walker had a cord of some sort in his hands. The only lighting in the basement was a light in the back of the work room and a light from the television. Walker "snuck up" on the man who was lying on a bed. He was lying on his side with his back turned toward Walker. Just as Walker stood over the man, the man turned his head

towards Walker and Walker wrapped the cord around the man's neck. Walker stood up and "pulled back on the man." As the man began to struggle less and less, Walker pushed him down on his stomach on the bed and put his knee behind the man's neck, pushing with his knee and pulling up on the cord. The man's head went down between the back of the bed and the end of the mattress. The reason why Walker wanted Nicholson along was to help Walker in case the man struggled.

When the man quit moving, Walker held him for a few more seconds to make sure the man was dead. Then, Walker asked Nicholson to pass him a sheet that was on the floor by a wall. Nicholson gave it to Walker who wrapped the man in the sheet. Walker dragged the body upstairs in a bear hug, out the back door and through the yard to the car in the alley. Walker told Nicholson to take the keys out of Walker's right jacket pocket and "yelled quietly" for Nicholson to "open the damn trunk." Nicholson got the trunk open and the two of them lifted the body and put it into the trunk of the car.

Walker and Nicholson got into the car after putting the body into the trunk and Walker drove to a spot a few miles away. Once there, Walker dragged the body out of the trunk and tossed the body down an embankment. They drove back to town and Walker let Nicholson off. Nicholson volunteered that he had earlier heard Ernestine and Walker whispering about Ernestine cleaning the house.

It can be fairly stated that the rest of the State's case consisted of evidence designed to corroborate this historical background. On a prior occasion, the State had obtained a conviction of first-degree intentional homicide as a party to a crime against Nicholson fol-

lowing a jury trial. The State subpoenaed Nicholson to testify on the State's behalf at Ernestine's trial. When called, Nicholson refused to testify. The State then moved that Nicholson's testimony from his trial be admitted pursuant to § 908.045, STATS. Ernestine objected. Ernestine observed that § 908.045(1) reads as follows:

> **(1)** FORMER TESTIMONY. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered.

Ernestine contended that Nicholson's testimony at his trial was not taken "at the instance of or against a party with an opportunity to develop the testimony . . . with a motive and interest similar" to hers. She also contended that her right to confrontation would be violated.

The trial court conducted the hearsay/confrontation analysis mandated by *State v. Bauer,* 109 Wis. 2d 204, 215, 325 N.W.2d 857, 863 (1982).[1] It initially considered whether the evidence fit

---

[1] The standard to be applied in determining whether hearsay evidence is admissible in a criminal case may be summarized as follows. The threshold question is whether the evidence fits within a recognized hearsay exception. If not, the evidence must be excluded. If so, the confrontation clause must be considered. There are two requisites to satisfaction of the confrontation right. First, the witness must be unavailable. Second, the evidence must bear some indicia of reliability. If the evidence fits within a firmly rooted hearsay exception, reliabil-

within a recognized hearsay exception. It ruled that it did. The confrontation clause was considered next. The trial court ruled that the witness was unavailable. Then, the trial court held that the evidence fit within a firmly recognized hearsay exception. Finally, the trial court ruled that nothing unusual warranted exclusion of the evidence. The trial court therefore overruled Ernestine's objection, and both Nicholson's direct and cross-examination were read to the jury. Subsequently, Nicholson's confession also came into evidence. Ernestine was convicted and she again takes issue with the admission of Nicholson's testimony on both hearsay and confrontation grounds.

We will discuss the hearsay argument first. Ernestine looks to the language of § 908.045(1), STATS., to support her. She understands the rule to say that Nicholson's former testimony should not have been used at her trial unless it was first shown that a party with a motive and interest similar to hers had a meaningful opportunity to examine the witness. She then posits that the cross-examining party at Nicholson's trial was the district attorney, and it cannot be said that the district attorney's motive and interests in examining Nicholson were similar to her own. She also contends that the examining party at Nicholson's trial was Nicholson's counsel, whose intent was to exculpate only

ity can be inferred and the evidence is generally admissible. This inference of reliability does not, however, make the evidence admissible per se. The trial court must still examine the case to determine whether there are unusual circumstances which may warrant exclusion of the evidence. If the evidence does not fall within a firmly rooted hearsay exception, it can be admitted only upon a showing of particularized guarantees of trustworthiness. *State v. Bauer*, 109 Wis. 2d 204, 215, 325 N.W.2d 857, 863 (1982).

Nicholson. Thus, the State's interest in Nicholson's trial was to inculpate everyone connected with the alleged conspiracy, while Nicholson's motive and interest was to exculpate only himself. Therefore, no party with an interest similar to hers had an opportunity to question Nicholson by either direct or cross-examination and the prerequisites for using § 908.045(1) were not present.

To accurately address her argument, it is important to describe the content of the Nicholson testimony that was read to the jury. Nicholson's direct testimony was a complete disavowal of his confession. Nicholson stated as follows. Several days before the killing, Walker and Ernestine's husband had been in a fight. Walker was crying and angry and threatened to kill Ernestine's husband. Prior to the murder, Nicholson had gone to visit Walker and Ernestine was there. Ernestine said something to Nicholson about his breaking her husband's arm or leg in return for money, but Nicholson declined. He did not take Ernestine seriously. On the night of the murder, Nicholson was again at Walker's home and Ernestine was present. She left without saying anything to Nicholson. Later, Walker asked Nicholson if he wanted to "go for a ride." Nicholson got into Walker's car and Walker drove to a house that Nicholson had never been to before.

Once at the house, he observed Walker use a key to enter the house through the back door. Nicholson followed and saw Ernestine in the kitchen. Walker and Ernestine went into a back room by themselves and began talking in whispered tones. Nicholson could not hear any of the conversation. Walker went down some stairs and called for Nicholson. When Nicholson arrived, Walker was straddling and shaking a man. Nicholson was preparing to run when Walker whipped

out a gun and ordered Nicholson to pass him the sheet that was lying nearby. Then Walker cocked the gun and threatened to kill Nicholson if he did not help. Walker then ordered Nicholson to help drag the body.

At no time did Nicholson see Ernestine in the basement. When Walker and Nicholson reached the top of the stairs with the body, he heard what he assumed was Ernestine leaving in her car. Nicholson did not go to the police for fear that Walker would harm his mother, brother, sister and nephews as Walker had threatened to do. Nicholson said that Ernestine had not called that night and, in fact, had said nothing to him that night.

On cross-examination, the district attorney went through Nicholson's recantation testimony point by point. She was unable to shake Nicholson's story. In fact, it is fair to say that the cross-examination only resulted in Nicholson being able to reiterate his retraction several more times for the jury to hear. In addition to the story told on direct examination, Nicholson also stated that he never put together that Ernestine and Walker were conspiring to kill Ernestine's husband. He also denied knowing that the house was Ernestine's.

We agree with Ernestine that the State did not have a motive or interest in examining Nicholson that was similar to Ernestine's interest. The State's entire cross-examination was an attempt to dent the credibility of the direct examination. A party whose motive and interests were similar to Ernestine's would not have done that. Instead, such party would have attempted to bolster the recantation of the confession or perhaps forgo cross-examination altogether.

However, we disagree that Nicholson's attorney did not have a motive or interest similar to that which Ernestine's attorney would have had if able to examine

Nicholson. While it is true that Nicholson's primary intent probably was to exculpate himself, the way he went about doing so was to tell a story exculpating Ernestine as well as himself while pointing the accusing finger at Walker. Nicholson's objective was to sow doubt in the credibility of his earlier confession. Ernestine's interest in examining Nicholson would have been similar. The vehicle for reaching Nicholson's objective was a statement exculpating himself and, in the process, exculpating Ernestine to a large extent as well. It is difficult to imagine that Ernestine's interests would have been substantially different. We determine that the interests were similar.

This case stands for a proposition similar to that in *State v. Barksdale,* 160 Wis. 2d 284, 466 N.W.2d 198 (Ct. App. 1991). There, the case of Barksdale's accomplice in a murder case was tried beforehand. An eyewitness named Odin presented testimony at that trial but was dead by the time of Barksdale's trial. The trial court allowed Odin's previous testimony to be read in at Barksdale's trial. Barksdale appealed, claiming that his interest was dissimilar to his accomplice because each was blaming the other for firing the fatal shot. We said, "Showing that Barksdale fired the shot would not absolve [the accomplice]." *Id.* at 289, 466 N.W.2d at 200. We reasoned that the two defendants' interests were similar respecting Odin's testimony because the testimony made both defendants parties to the crime, regardless of who fired the fatal shot.

Here, it is true that Nicholson in reality had an interest in exculpating only himself, while Ernestine had an interest in exculpating only herself. However, as *Barksdale* teaches, the interests need not be identical; they need only be similar. An examination of

327

Nicholson, whether conducted by Nicholson's attorney or Ernestine's, would be for the purpose of exculpation. In bringing out Nicholson's story, both exculpation interests would, in fact, be satisfied. In that respect, they are similar enough that the prerequisites to using § 908.045(1), STATS., are met.

Continuing the *Bauer* analysis, once having found that the hearsay fits under a recognized hearsay exception, the trial court must next move on to the confrontation question. The first question is whether Nicholson was unavailable; neither party disputes this. The second question is whether the hearsay fits within a well-recognized exception. Again, there is no dispute.

Ernestine claims that one question remains: whether there are any unusual circumstances existing such that the hearsay should not be allowed. The trial court addressed this question and found that none existed. The State claims that we need not reach this issue because, where proffered hearsay has sufficient guarantees of reliability to come within a firmly-rooted exception to the hearsay rule, the confrontation clause is satisfied and there is no need to go further. It cites *White v. Illinois*, 502 U.S. —, 112 S. Ct. 736, 743 (1992), and *State v. Jenkins,* 168 Wis. 2d 175, 200, 483 N.W.2d 262, 272 (Ct. App.), *cert. denied*, 113 S. Ct. 608 (1992), in support. We disagree with the State's reading of these two cases. What the cases really say is that if the hearsay falls within a well-recognized exception, then there need be no showing of particular guarantees of trustworthiness. If the hearsay does not fall within a well-recognized exception, then the hearsay may still be admitted, but only upon a showing that trustworthiness is guaranteed. These cases do not do away with

328

that part of the *Bauer* rule which says that, even if the hearsay falls within a well-recognized exception, it may nonetheless be excluded if there are unusual circumstances warranting its exclusion. *Bauer*, 109 Wis. 2d at 215, 325 N.W.2d at 863. *White* and *Jenkins* are simply inapplicable here.

Examining the unusual circumstances determination made by the trial court, we see no erroneous exercise of discretion. Nicholson's confession was already in front of the jury. Ernestine's task was to counteract that confession. There is nothing unusual about that. One way to counteract the confession would be to have a retraction by the confessing party exculpating the defendant. That is what occurred here by the reading of Nicholson's direct and cross-examination testimony which took place at his trial. We affirm.

*By the Court.*—Judgment affirmed.