The STATE of Ohio, Appellee,

v.

GONZALEZ,[1] Appellant.

[Cite as *State v. Gonzalez* (2000), 138 Ohio App.3d 853.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C-990478.

Decided Aug. 25, 2000.

---

**1.** Although the defendant's last name appears as "Gonzales" in the indictment and in a majority of the other papers filed in this case, appellate counsel has informed us that the correct spelling is "Gonzalez."

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Phillip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle,* for appellant.

*Per Curiam.*

Raising nine assignments of error, defendant-appellant Alexander Gonzalez appeals from his conviction of two counts of possession of cocaine in violation of R.C. 2925.11(A). Because we conclude that his first assignment is well taken, we reverse.

## FACTS AND PROCEEDINGS

On November 23, 1998, agents from the Cincinnati Regional Narcotics Unit ("RENU") initiated surveillance of the Ramada Inn located on Reading Road after they received a tip from a reliable, confidential informant that a stolen Acura was located in the parking lot of the hotel. The informant had further advised that Gonzalez and co-defendant Thurmond Green were involved in drug trafficking and might have some connection to the stolen vehicle.

Upon arriving at the hotel at approximately 10:30 a.m., RENU agents located the Acura and confirmed that it was, in fact, stolen. The agents also learned that Gonzalez and Green had hotel rooms registered in their names, that Gonzalez was a resident of New York, and that a Mazda 929 registered in his name and bearing New York license plates was parked in a remote area of the hotel's parking lot.

At approximately 12:20 p.m., agents observed Gonzalez leaving his hotel room and getting into a sports utility vehicle driven by Mass Samake. A group of agents followed Gonzalez and Samake, while other agents maintained surveillance at the hotel. The officers following Gonzalez and Samake observed them drive to Anthony Rodrigez's East Liberty Street apartment. Gonzalez and Samake both went into the apartment. When Samake left shortly thereafter, he was followed by several agents, who observed him drive to a car wash. Samake remained at the car wash for some time. At approximately 2:30 p.m., he left and drove to his mother's house. Shortly after Samake arrived at his mother's house, agents observed an individual arrive at the home and meet briefly with him.

At approximately the same time, agents maintaining surveillance at the Ramada Inn observed Green leave his room and get in the Acura. They immediately arrested him for possession of the stolen vehicle. Although their search of the car yielded no drugs, their interview with him furthered their suspicions that both Gonzalez and Samake were involved in drug trafficking.

Shortly after 3:00 p.m., agents observed Samake leaving his mother's house. They stopped him and searched his vehicle, finding $5,000 in United States currency. In response to questioning by police, Samake admitted that Gonzalez was involved in drug trafficking. He claimed that Gonzalez would transport cocaine from New York to Cincinnati in a hidden compartment under his car. According to Samake, Gonzalez unloaded the drugs in a rented garage on Colerain Avenue. Although Samake denied that he too was a "drug dealer," he admitted that he had provided Gonzalez with the names of individuals who were interested in purchasing cocaine and that he had delivered cocaine for Gonzalez on several occasions.

With regard to the events of that day, Samake told agents that when he picked up Gonzalez at the Ramada Inn, Gonzalez had been carrying a black and yellow Nike bag underneath his coat and had stated that he had two or three kilos of cocaine with him. Samake also said that when he was inside Rodrigez's apartment, he had seen Gonzalez weighing powder and crack cocaine. Additionally, he told agents that Gonzalez had called him on his cell phone while he was at the car wash and had inquired about where he was. According to Samake, after he informed Gonzalez that he was on his way to his mother's house, Gonzalez told him to expect "someone" to deliver "something" to him there. Samake explained that, after he arrived at his mother's, an individual known to him as "C" or "Curt" dropped off a bag containing crack cocaine. Samake told agents that Curt was returning cocaine that he had previously delivered to him for Gonzalez, because it was of poor quality. According to Samake, he then hid the cocaine in his mother's house until he could give it back to Gonzalez. Samake gave agents permission to search his mother's house and told them where they could find the

cocaine. Following his directions, agents located seventeen ounces of crack cocaine.

Utilizing a canine unit, agents at the Ramada Inn examined the exterior of Gonzalez's Mazda. The dog "honed in on" the left rear quarter panel of the car, indicating that it had scented narcotics in that area. After towing the car to a police station, agents found a hidden compartment on the underside of the vehicle.

At approximately 5:00 p.m., Gonzalez left Rodrigez's East Liberty Street apartment on foot, carrying a black and yellow Nike bag. Officers stopped him and searched the bag, finding keys to the Mazda as well as to the Colerain Avenue garage identified by Samake.

Shortly thereafter, agents observed Rodrigez and his girlfriend leaving the apartment on East Liberty Street. Agents stopped their vehicle and took them to the station for questioning. Rodrigez consented to have his apartment searched, but no drugs were found. After continued questioning by police, however, Rodrigez agreed to make a recorded statement. In his statement, Rodrigez acknowledged that Gonzalez had brought cocaine with him into the apartment. According to Rodrigez, Gonzalez had not wanted to take the cocaine with him when he left the apartment and had requested that Rodrigez keep it for him. Rather than keeping the cocaine in his apartment, Rodrigez explained, he had moved it to a closet located in a hallway on the second floor of the building. Based on these revelations, agents recovered approximately 1,400 grams of powder cocaine and 164 grams of crack cocaine, as well as two digital scales.

Gonzalez, Samake, and Green were charged jointly in one indictment. Rodrigez was not charged. The three counts against Gonzalez were for possession of cocaine. Each of the counts carried a specification alleging that Gonzalez was a major drug offender. Samake was charged with one count of possession of cocaine; this charge also carried a specification alleging that Samake was a major drug offender. Green was charged with receiving stolen property.

At Gonzalez's jury trial, Samake testified as a witness for the state. In addition to providing testimony regarding Gonzalez's activities, Samake positively identified the cocaine recovered from the closet in Rodrigez's apartment building as the same cocaine that he had seen Gonzalez weighing. Samake also identified one of the scales recovered from the closet as the one that Gonzalez had used to weigh the cocaine.

Rodrigez was also called as a witness by the state, but invoked his Fifth Amendment privilege against self-incrimination and refused to testify. As a result, he was deemed unavailable, and the state was permitted to introduce the recorded statement that he had given to police. Additionally, Officer Gramke,

who had taken the recorded statement, was permitted to testify about what Rodrigez had said during the interview.

At the conclusion of the trial, the jury returned guilty verdicts on the two counts of the indictment and the accompanying specifications that related to the cocaine found at Rodrigez's apartment building on East Liberty Street. With respect to the count of the indictment involving the cocaine found at Samake's mother's house and its accompanying specification, the jury returned a verdict of not guilty. The trial court subsequently imposed maximum consecutive sentences for the offenses. This appeal followed.

## ASSIGNMENTS

In his first assignment of error, Gonzalez asserts that his Sixth Amendment right to confront and cross-examine witnesses against him was violated by the trial court's admission of hearsay evidence, specifically Rodrigez's recorded statement and Gramke's testimony regarding the statement. The evidence was admitted after the trial court had found that Rodrigez was unavailable within the meaning of Evid.R. 804(A) and that his statement constituted one against penal interest under Evid.R. 804(B)(3).

Even if Rodrigez's statement fit within the Evid.R. 804(B)(3) exception to the hearsay rule, its admission may still have resulted in a violation of Gonzalez's Sixth Amendment right to confront the witnesses against him. The test to determine whether admission of an out-of-court statement violates a defendant's right to confront witnesses is whether the statement is "so trustworthy that adversarial testing can be expected to add little [to the statement's] reliability." [2]

Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination, when they (1) fall within a firmly rooted hearsay exception or (2) contain adequate indicia of reliability.[3] Accordingly, to be admissible, Rodrigez's statement had to meet one of the two criteria.

At the time Gonzalez was tried, *State v. Gilliam*[4] was the law in Ohio. Under *Gilliam*, a "statement against interest" under Evid.R. 804(B)(3) was considered a "firmly rooted hearsay exception." Accordingly, a statement against interest made by an unavailable accomplice could be admitted pursuant Evid.R. 804(B)(3) without violating a defendant's confrontation rights.

---

**2.** *White v. Illinois* (1992), 502 U.S. 346, 357, 112 S.Ct. 736, 743, 116 L.Ed.2d 848, 860, quoted in *State v. Madrigal* (2000), 87 Ohio St.3d 378, 385, 721 N.E.2d 52, 61.

**3.** *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 607–608.

**4.** (1994), 70 Ohio St.3d 17, 635 N.E.2d 1242.

■ Here, the trial court relied on *Gilliam* in admitting Rodrigez's statement. But, in the time between Gonzalez's trial and this appeal, *Gilliam* was overruled. Pursuant to *Lilly v. Virginia*[5] and *State v. Madrigal,*[6] where, as here, an accomplice's statement against interest also inculpates the accused by shifting or spreading blame to him, it is *not* within a firmly rooted hearsay exception. Moreover, such a statement is deemed presumptively unreliable. This presumption can be overcome only where the statement is shown to possess indicia of reliability by virtue of its "inherent trustworthiness."[7]

■ Pursuant to *Griffith v. Kentucky,*[8] wherein the United States Supreme Court held that a new rule for the conduct of a criminal prosecution is to be applied retroactively in all cases pending on direct review or not yet final, we apply the rule of law pronounced in *Lilly* and *Madrigal* to the instant case. Accordingly, unless it can be said that Rodrigez's statement was "inherently trustworthy," we must hold that its admission was error. In making this determination, we note that a plurality of the United States Supreme Court in *Lilly* cautioned that "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplice's confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing."[9]

■ Here, the state offers no argument that Rodrigez's statement was inherently reliable, but, instead, contends that facts known to the police at the time of the statement's making, which tended to corroborate the statement, served to demonstrate the statement's reliability. But, as the state acknowledges, the presence of corroborating evidence is irrelevant to a determination of reliability under *Lilly* and *Madrigal.* We, therefore, reject this argument.[10]

In our view, Rodrigez's statement and the circumstances surrounding it did nothing to rebut the presumption of unreliability that attached to the statement.

---

5. (1999), 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117.

6. (2000), 87 Ohio St.3d 378, 721 N.E.2d 52; see, also, *State v. Strong* (Feb. 18, 2000), Hamilton App. No. C–971036, unreported, 2000 WL 192128.

7. *Lilly,* 527 U.S. at 137–138, 119 S.Ct. at 1900–1901, 144 L.Ed.2d at 134–135.

8. (1987), 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649.

9. *Lilly,* 527 U.S. at 137, 119 S.Ct. at 1900, 144 L.Ed.2d at 135.

10. *Lilly,* 527 U.S. at 137–138, 119 S.Ct. at 1900–1901, 144 L.Ed.2d at 134–135; *Madrigal,* 87 Ohio St.3d at 387, 721 N.E.2d at 62–63.

The statement, which shifted blame to Gonzalez, was made in response to police interrogation and was never subjected to adversarial testing. Moreover, Gramke testified that he "caught [Rodrigez] in a few lies" during the interrogation. Accordingly, we conclude that the statement lacked adequate indicia of reliability and that its admission into evidence resulted in a violation of Gonzalez's confrontation rights. But, in order to determine whether the trial court's error in admitting this evidence requires reversal of Gonzalez's convictions, we must also decide whether the error resulted in prejudice or whether it was harmless.

█ Apart from Rodrigez's statement and Gramke's testimony regarding it, the only evidence linking Gonzalez to the cocaine found at the building on East Liberty Street was Samake's testimony. The majority of this testimony, however, related to Gonzalez's alleged involvement with the drugs recovered from Samake's mother's house, which was apparently insufficient to convince the jury that Gonzalez was guilty of that charge. From this, it is reasonable to infer that the jury questioned Samake's credibility. It would stand to reason, then, that, although Samake's testimony may have been legally sufficient to demonstrate that Gonzalez constructively possessed the cocaine found on East Liberty Street, the jury may still have been reluctant to rely solely upon this testimony in finding Gonzalez guilty in connection with that cocaine. And even if the jury did find Samake's testimony regarding the East Liberty Street cocaine to be credible, the limited nature of the testimony left several things open to question. Most notably, the testimony failed to demonstrate how the cocaine arrived in the closet of Rodrigez's apartment building. By clarifying this point, Rodrigez's statement linked Gonzalez to the cocaine in a definite and persuasive fashion. What is more, Rodrigez's statement had the additional effect of bolstering and corroborating Samake's testimony regarding Gonzalez's possession of the cocaine. Under these circumstances, the statement was not merely cumulative of Samake's testimony.

Moreover, the jury may have placed special emphasis on Rodrigez's statement, given that the statement was, in effect, presented on two occasions: once when the recording of the statement was played and a second time when Gramke testified about Rodrigez's interview.

In light of the facts that Rodrigez's statement contained information that was particularly significant to the charges of which Gonzalez was found guilty and that was not otherwise before the jury, and that greater emphasis was placed on this evidence than upon the remaining evidence in support of the charges, we cannot say beyond a reasonable doubt that the jury would have found Gonzalez guilty of the charges had the statement not been admitted into evidence. Accordingly, we conclude that the admission of the statement was not harmless. The first assignment of error is well taken.

Given our disposition of Gonzalez's first assignment, the remaining assignments of error, with the exception of the sixth assignment which challenges the sufficiency of the evidence, have been rendered moot. Therefore, we address only the sixth assignment.

■ In the sixth assignment of error, Gonzalez asserts that the trial court erred in denying his Crim.R. 29(A) motion for acquittal. We disagree. Based on the evidence presented at trial, specifically Samake's testimony that he saw Gonzalez weighing cocaine later found at East Liberty Street, the jury could have found beyond a reasonable doubt that Gonzalez had constructively possessed the cocaine.[11] Accordingly, we reject the sixth assignment of error.

The judgment of the court of common pleas is hereby reversed, and this cause is remanded for further proceedings in accordance with law.

*Judgment reversed*
*and cause remanded.*

DOAN, P.J., GORMAN and SUNDERMANN, JJ., concur.

11. See *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus; *State v. Brown* (Sept. 25, 1996), Hamilton App. No. C–950300, unreported, 1996 WL 539785.