Victor SAMARRON, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–01–00124–CR.

Court of Appeals of Texas,
San Antonio.

Sept. 1, 2004.

From the 290th Judicial District Court, Bexar County, Texas, Trial Court No. 2000CR4546; Phil Chavarria, Jr., Judge Presiding.[1]

Suzanne M. Kramer, San Antonio, for appellant.

Matthew W. Paul, State's Prosecuting Atty., Jeffrey L. Van Horn, First Asst. State's Atty., Austin, Daniel Thornberry, Asst. Criminal Dist. Atty., San Antonio, for appellee.

1. Sitting by assignment.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Victor Samarron was found guilty by a jury of murder and sentenced to sixty-five years imprisonment. In an opinion and judgment dated August 14, 2002, we affirmed Samarron's conviction. Because Samarron did not file a petition for discretionary review, on October 25, 2002, the mandate issued in this appeal. On June 9, 2004, however, the court of criminal appeals granted Samarron leave to file an out of time petition for discretionary review. On August 5, 2004, Samarron filed a petition for discretionary review. In his petition, Samarron argues that his second issue should have been sustained because the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), applies to his appeal and requires reversal of his conviction. Because we agree with Samarron, we withdraw our opinion and judgment of August 14, 2002, and issue this opinion and judgment in its place. *See* TEX.R.APP. P. 50.

## BACKGROUND

In the evening hours of June 11, 2000, Michelle Coffee, Raul Garcia, Gabriel Gomez, and the victim, Jose Luis Villatoro were sitting around a pick-up truck and drinking beer. A small, grey car stopped near the group, and three men got out of the car. These men came up to the group, pushed Coffee, Garcia, and Gomez out of the way, and attacked Villatoro. One man stabbed Villatoro while another man hit Villatoro over the head with a hammer.

These three men then got back into the grey car and drove away. Villatoro was transported by ambulance to the hospital and died a few hours later. Coffee, Garcia, and Gomez went to the police station where they were questioned by the police. An hour after the incident, Garcia gave the following statement to the police:

I got up from bed at around 6 p.m. I went downstairs and I saw a white girl with Louie [Villatoro], he's from South American [sic]. He used to live there but not anymore. Gabriel was there too. They were all in the driveway and they were drinking. I went over and began drinking with them. We were standing and sitting on the tailgate of the blue truck that the white girl was driving. I was sitting on the tailgate facing away from the street. I saw a grey car like a driving [sic]—Chevy Corsica, a little car. There were three guys that got out of the car and they all—they were all Chicanos. Excuse me. They came up to us and one of the guys pushed me out of the way and he knifed Louie on the side. I think Louie was bleeding from the neck. One of the guys had a hammer and he had Louie on the ground and he began hitting with—hitting Louie with the hammer on the head. He hit Louie about two times. Louie got up and ran across the street. The guys got back into the car and took off down Courtland. The guy that had the knife was about 55 years old. He weighed about 155 pounds, dark with short hair. I don't remember what he was wearing. The other guy with the hammer had short hair, was about 25 to 26 years old. He was about 5' 6" tall. The hammer had a pipe handle and it was square. The guy that stabbed Louie is called "Con." He used to live there with us on East Courtland. Now he lives at Ashby and McCullough the first house behind the bar. The reason "Con" is after Louie is because Louie's wife was seeing "Con" while Louie was in jail for five months. On 6–11–00 at 9:45 p.m. Detective Martinez asked me to look at a photograph. I told Detective Martinez the man in the photograph is the man I know as "Con," the guy that stabbed Louie today. Detective Martinez told me I identified Victor Samarron, a Latin male, 07–18–43. Detective Martinez asked me to sign and date the back of the photograph. I did and that is all I know. I have read my statement and it is true and correct.

From this information, Detective Martinez discovered that "Con" was Victor Samarron. Martinez obtained a picture of Samarron from the identification section in the Sheriff's office. Martinez showed this picture to Garcia who identified the man in the picture as the assailant.

At trial, Coffee testified that she had seen Villatoro the night before the murder. Villatoro was upset that his ex-wife, Janet Lambert, was with another man whom Coffee identified as Samarron. Coffee testified that on June 11, she was seated with Garcia and Gabriel on the tailgate of her truck, drinking beer. Villatoro was standing in front of the group when three men got out of a car. The men grabbed Villatoro and attacked him. Coffee identified Samarron as one of the assailants. On cross-examination, however, Coffee admitted that one hour after the murder, she had been unable to identify Samarron. It was only three to four weeks later that Coffee was able to identify Samarron in a photo array.

Garcia did not testify at trial. Garcia's statement, however, was admitted into evidence as an excited utterance.

### IDENTIFICATION OF SAMARRON

In his first issue, Samarron argues that the trial court should have suppressed

Coffee's identification of Samarron as the assailant, because the State secured her identification through impermissibly suggestive procedures. Specifically, Samarron argues that it was impermissibly suggestive for the State to show Coffee a single photograph. On direct examination by the State, Coffee identified Samarron as the assailant and explained that she picked his photograph from a photo array shown to her by the police three to four weeks after the murder. On cross-examination, however, Samarron's attorney asked Coffee whether a police officer showed her a single photograph on the night of the murder. Coffee answered yes. At this time, Samarron's trial counsel did not object to Coffee's identification as being impermissibly suggestive, but instead attempted to impeach her identification. On re-direct, Coffee equivocated and testified that she may not have been shown a single photograph on the night of the murder. After Coffee stepped down from the witness stand and the jury was excused for lunch, Samarron's attorney made the following objection:

> But see, sir, my initial request—my initial argument was that—because that one officer showed that one photograph, that tainted all of the other identity—it's all fruit of the poisonous tree.[2] That being the first—that's what I'm contesting, the first initial showing of one photograph. Because of that, it taints everything else that follows up. That's my argument. Not what other officers did, but what this one officer—it taints the whole identity.... Sir, just so the record is really clear what my argument is, is not—my argument is that when the police officer shows one photo to one

witness, that witness has contact with another witness, that taints the identity. The trial court responded, "But, you're assuming that Raul [Garcia] contacted Coffee. There's no evidence of that." Samarron's attorney replied:

> What I'm saying is that once a police officer conducts a suggestive lineup, an illegal identification, it taints all further identification that come[s] out of that initial ID. And there—this photograph—the lineup, State's Exhibit No. 16 comes from the same initial photograph that was shown. That's my argument. That because the police officer did something wrong from the beginning, it taints every other lineup dealing with my client, Victor Samarron.

Samarron's objection, however, was untimely. Samarron's trial counsel should have objected to Coffee's identification as soon as she testified that she was shown a single photograph on the night of the murder. Samarron's issue is, therefore, not preserved for appeal. *See* TEX.R.APP. P. 33.1. Even had Samarron's trial counsel timely made this objection, however, the issue would still not be preserved for appeal. Samarron objected to the procedures surrounding Raul Garcia's identification, arguing that because of impermissibly suggestive procedures, Raul Garcia's identification tainted Coffee's identification. Samarrron did not object to the procedures surrounding Coffee's identification. We, therefore, overrule Samarron's first issue.

## LEGAL SUFFICIENCY

■ In his third issue, Samarron argues that there is legally insufficient evidence to support his conviction, because the State did not establish his complicity as a party,

---

2. Samarron's attorney is referring to Samarron's pre-trial motion that argued for the suppression of Garcia's identification because the police showed him a single photograph. The trial court denied Samarron's motion.

but merely proved his presence at the scene of the murder. We disagree.

When conducting a legal sufficiency-of-the-evidence review as prescribed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we do not weigh the evidence tending to establish guilt against the evidence tending to establish innocence, nor do we assess the credibility of witnesses on each side. *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex.Crim. App.1996). We review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim.App.1998).

■ At trial, Michelle Coffee testified that she saw three men get out of a car and attack Villatoro. She saw one of the men holding a knife while another one held a hammer. The man holding the knife stabbed Villatoro several times while the other man hit Villatoro over the head with the hammer. She identified Samarron as the man with the hammer. In addition to Coffee's testimony, Garcia's written statement was introduced into evidence and read to the jury. Garcia's statement also affirms that Garcia saw three men get out of a car and attack Villatoro. One man had a hammer and was hitting Villatoro with it. Another one had a knife and was stabbing Villatoro. Unlike Coffee, Garcia's statement provides that Samarron was the man who actually stabbed Villatoro, thereby causing his death.[3] There is, therefore, evidence that Samarron was one of the three assailants who simultaneously attacked Villatoro and that Samarron was either the man who stabbed Villatoro to death or the man who hit Villatoro with the hammer, thereby participating in the attack as a party. *See* TEX. PEN.CODE ANN. § 7.02(a)(2) (Vernon 1994). And, there is evidence of motive: Coffee testified that Samarron and Villatoro were competing over the affection of the same woman. We, therefore, hold that Samarron's conviction for murder is supported by legally sufficient evidence.[4]

### EXCITED UTTERANCE

■ In his second issue, Samarron argues that admission of Garcia's written statement into evidence as an excited utterance violated the rules of evidence and the Confrontation Clause under the Sixth and Fourteenth Amendments to the Con-

---

3. The medical examiner testified that Villatoro's fatal injury was the "stab wound to the trunk."

4. Even though we are sustaining Samarron's second issue and holding that Garcia's statement was erroneously admitted in violation of the Confrontation Clause, we must still consider Garcia's statement for purposes of sufficiency. The court of criminal appeals has explained:

In assessing the sufficiency of the evidence to support conviction, *a reviewing court must consider all evidence* which the jury was permitted, whether rightly or wrongly, to consider. In the event a portion of this evidence was erroneously admitted, the ac-cused may complain on appeal of such error. If his complaint has merit and the error is reversible, ... a new trial should be ordered. But jurors do not act irrationally taking such evidence into account, since they are bound to receive the law from the trial judge. All evidence which the trial judge has ruled admissible may therefore be weighed and considered by the jury, and a reviewing court is obliged to assess the jury's factual findings from this perspective. *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim.App.1988) (emphasis in original) (citations omitted); *accord Moff v. State*, 131 S.W.3d 485, 488 & n. 11 (Tex.Crim.App. 2004).

stitution.[5] For support, Samarron relies on the Supreme Court's recent opinion in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).[6] Until *Crawford* was decided in March 2004, the scope of a defendant's Confrontation Clause rights was delineated by *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Under this test, a hearsay statement was *per se* reliable under the Confrontation Clause if it fell within a "firmly rooted" exception to the hearsay rule. *Guidry v. State*, 9 S.W.3d 133, 149 (Tex.Crim.App.1999), *cert. denied*, 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000). And, the excited utterance exception to the hearsay rule was a firmly rooted exception. *See White v. Illinois*, 502 U.S. 346, 355 n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Penry v. State*, 903 S.W.2d 715, 751 (Tex.Crim.App.1995);

*Bernal v. State*, 13 S.W.3d 852, 854 (Tex. App.-Austin 2000, pet. ref'd).

■ *Crawford*, however, recently abrogated *Roberts* with respect to statements that are "testimonial" in nature.[7] Under *Crawford*, the admission of testimonial hearsay violates the Confrontation Clause unless the declarant is shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at ——— ———, 124 S.Ct. at 1373–74. Although the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial," it stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 1374.

Here, Samarron argues that the admission of Garcia's statement violated the Confrontation Clause because the statement was testimonial. We agree. Detective Louis Martinez testified that upon arriving at the scene, Officer Mike Lopez

5. Samarron also argues that his rights under article 1, section 10 of the Texas Constitution were violated. Samarron, however, has not explained how his rights under the Texas Constitution would differ from those under the United States Constitution. Samarron has, therefore, improperly briefed the issue of whether his rights under the Texas Constitution were violated. *See* TEX. R.APP. P. 38.1(h).

6. In his petition for discretionary review, Samarron argues that *Crawford* should apply retroactively. The Supreme Court's retroactivity analysis, however, is not an issue here as Samarron is still on direct appeal. His conviction is not yet final. Whether new constitutional rules apply retroactively is applicable when a defendant is collaterally attacking his conviction. Under the Supreme Court's "retroactivity analysis as set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), federal habeas corpus petitioners may not avail themselves of new rules of criminal procedure outside two narrow exceptions." *Beard v. Banks*, —— U.S.

——, ——, 124 S.Ct. 2504, 2508, 159 L.Ed.2d 494, 500–501 (2004). Thus, under *Teague*, unless they fall within one of these exceptions to the general rule, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310, 109 S.Ct. 1060. A conviction becomes "final" for purposes of *Teague's* retroactivity analysis when "the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Beard*, —— U.S. at ——, 124 S.Ct. at 2510 (citations omitted).

7. The Court held that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1374.

told him that Garcia had witnessed the murder. Because Garcia agreed to go to the police station to give a statement, Detective Martinez did not question Garcia at the scene. At the police station, while Detective Martinez and Garcia sat in a cubicle, Detective Martinez questioned Garcia about what he had witnessed:

Q: Now, sir, these answers-this statement was a result of you questioning [Garcia]; was it not?

A: I asked him what happened, yes.

Q: It was not a spontaneous answer that he gave you, it wasn't a spontaneous statement-it wasn't something that he told you without you having to question him?

A: I asked him what happened, what next and then what and then what.

Q: So you kept having to ask him, "and then what and then what?" It wasn't something that he was-

A: Because I'm typing. I can't type as fast as he talks.

Q: So he didn't even write this statement, is that what you're saying?

A: Correct.

Under these facts, we hold that Garcia's statement is "testimonial." Garcia did not spontaneously tell Detective Martinez what had happened at the scene. Instead, after being questioned by Detective Martinez, he gave a formal, signed, written statement to the police. *See Crawford,* 541 U.S. at ——, 124 S.Ct. at 1364 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Thus, under *Crawford,* Garcia's statement is inadmissible unless Garcia was unavailable to testify at trial and Samarron had had a prior opportunity to cross-examine him. Here, Samarron did not have an opportunity to cross-examine him before

trial. Therefore, Samarron's rights under the Confrontation Clause were violated.

■ Having found constitutional error, we must reverse the trial court's judgment unless we can determine beyond a reasonable doubt that the error did not contribute to the conviction. *See* TEX.R.APP. P. 44.2(a). In *Shelby v. State,* 819 S.W.2d 544, 547 (Tex.Crim.App.1991), the court of criminal appeals adopted the Supreme Court's analysis in *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), for assessing harm in Confrontation Clause cases. *See also De La Rosa v. State,* 961 S.W.2d 495, 499 (Tex.App.-San Antonio 1997, no pet.) (applying *Van Arsdall* factors). "[S]ince a violation of the right to cross-examination under the Confrontation Clause necessarily means the testimony was not permitted before the fact finder, the Court was called upon to develop a harmless error analysis where evidence had been excluded." *Shelby,* 819 S.W.2d at 547. Thus, the Supreme Court established a three prong analysis. *Id.* First, we assume that the damaging potential of the cross-examination was fully realized. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. Second, with that assumption in mind, we review the error in connection with the following factors: the extent of cross-examination otherwise permitted; the importance of the witness's testimony in the State's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting material points of the witness's testimony; and the overall strength of the State's case. *Id.* Finally, in light of the first two prongs, we determine if the error was harmless beyond a reasonable doubt. *Id.*

Here, the trial court allowed the defense to cross examine witnesses who appeared at trial, in particular, Michelle Coffee. However, there was no cross-examination

of Garcia; his statement was simply read into evidence by Detective Martinez. And, Garcia's statement was extremely important to the State's case. Besides Garcia's statement, Michelle Coffee was the only witness to give testimony about events leading to the murder. Although her testimony corroborated the sequence of events in Garcia's statement, the State's case rested on Coffee's identification of Samarron as the assailant. Coffee testified that one hour after the murder she was unable to identify Samarron; however, three to four weeks later, she was able to identify Samarron out of a photo array. Given Coffee's failure to identify Samarron immediately after the murder, Garcia's statement corroborating Coffee's identification was essential to the State's case. We, therefore, cannot find beyond a reasonable doubt that the admission of Garcia's statement did not contribute to Samarron's conviction. As such, we sustain Samarron's second issue.

Having sustained Samarron's second issue, we need not reach Samarron's fourth issue, factual sufficiency.

### CONCLUSION

Because Samarron's rights under the Confrontation Clause were violated and because we cannot find the error harmless, we reverse the judgment of the trial court and remand this cause to the trial court for further proceedings consistent with this opinion.