Ray GONZALEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–03–00819–CR.

Court of Appeals of Texas,
San Antonio.

Dec. 15, 2004.

Julie B. Pollock, Hitchings & Pollock, San Antonio, for appellant.

Enrico B. Valdez, Sommer Hoffman, Asst. Criminal Dist. Atty's, San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by CATHERINE STONE, Justice.

Ray Gonzalez appeals his conviction and life sentence for capital murder. Gonzalez presents two issues on appeal: (1) whether he was denied his right to confrontation when the trial court admitted incriminating hearsay statements made by an unavailable witness; and (2) whether the trial court erred in failing to instruct the jury on a lesser included offense. We affirm.

### BACKGROUND

On May 3, 2002, the San Antonio Police Department dispatched officers to the home of Maria and Baldomero Herrera after receiving two 911 calls from the residence. Several officers arrived at the residence approximately six minutes after receiving the second call for assistance. When they arrived, the officers observed Maria lying in a pool of blood near the front door. They also observed Baldomero sitting in a chair, unconscious and covered in blood. Upon arriving, the officers questioned Maria about what had happened, and she responded that she and her husband were shot by an individual living with or known by the people who live in the rock house across the street. Maria told officers that the gunman was an 18–year–old Latin male with dyed blonde hair. Maria further indicated that the gunman stole her white Nissan truck.

Officers subsequently located Maria's stolen vehicle and an individual fitting the description given by Maria. After an intense high speed chase, officers apprehended the driver of the vehicle, Ray Gonzalez. Upon apprehending Gonzalez, officers discovered property belonging to the Herreras in Gonzalez's pockets and found Maria's blood on Gonzalez's sneakers. Gonzalez was charged with capital murder after Maria and Baldomero died of their gunshot wounds. A jury found Gonzalez guilty of the alleged offense, and Gonzalez was sentenced to life in prison.

### HEARSAY EVIDENCE

Gonzalez complains the trial court erred in allowing the investigating police officers to testify concerning the statements Maria made to them upon their arrival at the crime scene. First, Gonzalez contends Maria's out-of-court statements do not qualify as excited utterances because they were made in response to police questioning. Second, Gonzalez argues the admission of Maria's out-of-court statements violated his Sixth Amendment right to confrontation because the statements are testimonial and he had no opportunity to cross-examine Maria before she died.[1]

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX.R. EVID. 801(d). The Texas Rules of Evidence provide an exception to this rule for "excited utterances." TEX.R. EVID. 803(2). An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* When determining whether a hearsay statement is

admissible as an excited utterance, we may consider the time elapsed and whether the statement was in response to a question. *Zuliani v. State*, 97 S.W.3d 589, 595–96 (Tex.Crim.App.2003). "However, it is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception." *Id.* at 596. The critical factor to consider when determining if a statement is an excited utterance is " 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' " or condition at the time of the statement. *Id.* (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex.Crim. App.1992)). In other words, a court must determine whether the statement was made " 'under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.' " *Id.* Whether an out-of-court statement is admissible under an exception to the hearsay rule is a matter within the trial court's discretion. *Id.* at 595.

The trial court held a hearing outside the presence of the jury to determine if Maria's statements to Officers Thomas McGowan, Dennis Cartwright, and Michael Oliva were admissible. Officer McGowan testified that he and Officer Garrett Hunter arrived at the crime scene approximately six minutes after being notified of Maria's second 911 call. When the officers arrived at the Herrera residence, they observed Maria lying in a pool of blood near the front door. They also observed Baldomero sitting in a chair, unconscious, and gasping for breath. According to Officer McGowan, Maria was very talkative and

---

1. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him." U.S. CONST. amend VI.

excited. He further stated that Maria appeared to be in a state of shock. Maria asked the officers to help her several times, although it did not appear to Officer McGowan that Maria truly understood the seriousness of her physical condition. Officer McGowan stated that Maria "was doing a lot of moving on the floor" and she made several phone calls while lying on the floor. He further stated that when he questioned Maria regarding what had happened, Maria could not give him the name of the shooter; rather, Maria told him that the person who shot her was related to the people who live in the rock house across the street. Maria further described the shooter as "a Latin male ... blondish colored hair, about 18 years old."

Officer Cartwright arrived at the Herrera residence shortly after Officers Hunter and McGowan. Upon his arrival, he too observed Maria lying on the floor covered in blood. Officer Cartwright also observed an elderly gentleman, who appeared to be deceased, sitting in a chair. According to Cartwright, Maria looked in poor condition and in extreme pain. Maria was crying and asking for help. Cartwright testified Maria indicated that a man with dyed blonde hair shot her and that she recognized the man from the brick or stone house across the street. He further testified that Maria told the officers the shooter stole her truck.

Finally, Officer Oliva testified that he arrived at the Herrera residence after Officers Hunter, McGowan, and Cartwright. When Oliva arrived, he observed Maria lying on the floor with blood on her. Officer Oliva also observed Baldomero sitting in a chair. Officer Oliva testified that Maria was frightened and "in a lot of pain." Maria appeared to be under the stress of being shot and complained that her stomach hurt. Officer Oliva stated he decided to requestion Maria in Spanish regarding what had happened because it did not appear that she understood English very well. According to Oliva, Maria told him a young Hispanic male with dyed hair shot her. Maria further stated that the shooter lived with or was related to the people living across the street in the house with a rock exterior. When asked what else had happened, Maria told Oliva that the shooter stole her truck.

The trial court determined that Maria's statements to Officers McGowan and Oliva were admissible as excited utterances, and that they could qualify as present sense impressions and statements of an existing state of physical condition. The trial court further found Maria's statements to Officer Cartwright were admissible as well, although the court did not state the grounds for its ruling. On appeal, Gonzalez does not challenge the admission of Maria's statement that she had been shot or that she was in pain because he concedes that such statements could qualify either as excited utterances, present sense impressions, or statements of Maria's then existing state of physical condition. Rather, Gonzalez challenges the admission of Maria's statements concerning who committed the offense, the shooter's physical characteristics, and the shooter's place of residence. After reviewing the evidence, we are of the opinion that Maria's statements qualify as excited utterances.[2]

In *Ross v. State*, the defendant argued that his victim's statements to a co-worker and an ambulance attendant shortly after she was allegedly shot by the defendant were not excited utterances. 879 S.W.2d

---

2. Gonzalez conceded during oral argument that Maria's statements concerning who committed the offense, the shooter's physical characteristics, and the shooter's place of residence were essentially excited utterances.

248, 249 (Tex.App.-Houston [14th Dist.] 1994, pet. ref'd). There, the defendant shot his girlfriend as she parked her car outside her employer's office. *Id.* at 248–49. One of the victim's co-workers rushed to the victim's aid and asked the victim "who shot her?" *Id.* at 249. The victim identified her boyfriend as the assailant. *Id.* The victim, while en route to the hospital, then told the ambulance attendant monitoring her condition that her boyfriend had shot her. *Id.* The *Ross* court held that the victim's statements identifying her murderer were excited utterances. *Id.* The court determined the statements constituted excited utterances even though some of the statements were in response to questions because the victim was under the stress of being shot four times by her boyfriend; the statements were made within a relatively short period of time following the shooting;[3] the severity of the victim's injuries suggested that she was "dominated by the emotions, excitement, fear, and pain of the event at the time she made both statements"; and the statements related to the occurrence preceding them. *Id.*

In the case at bar, the Herreras were shot by an assailant a relatively short period of time before police arrived at their residence. The investigating officers all testified that upon entering the Herrera residence, they observed Baldomero unconscious in a chair and saw Maria lying on the floor. Several of the officers testified that there was blood on or near Maria. At the time Maria made the statements implicating Gonzalez, she claimed to be in pain, begged for medical assistance, and was visibly shaken by what had occurred. It is reasonable to infer from this evidence that a startling event had occurred at the

Herrera residence and that Maria was still under the stress caused by that event when she made the statements relating to the shooting. The fact that some of Maria's statements were in the form of responses to questions does not make them inadmissible under the excited utterance exception to the hearsay rule. *See Zuliani,* 97 S.W.3d at 596. The key is whether Maria was still dominated by the emotions, excitement, fear, or pain of the shooting at the time the statements were made, which Maria undoubtedly was. *See id.*

■ Although we have concluded that Maria's statements fall under the excited utterance exception to the hearsay rule, we must further analyze her statements in light of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In March 2004, the United States Supreme Court changed the legal landscape for determining whether admission of certain hearsay statements violates an accused's right of confrontation. Before *Crawford,* a confrontation challenge to the admissibility of an out-of-court statement offered against an accused was governed by *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Under *Roberts,* an unavailable witness's out-of-court statements could be admitted at trial when the statements fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531. The hearsay exception for excited utterances was considered to be among those "firmly rooted" exceptions that carried sufficient indicia of reliability to satisfy the Sixth Amendment's Confrontation Clause. *See White v. Illinois,* 502 U.S. 346, 355 n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992);

---

**3.** Some of the statements were made minutes after the shooting while others were made within thirty to forty-five minutes of it.

*Penry v. State*, 903 S.W.2d 715, 751 (Tex. Crim.App.1995).

*Crawford*, however, abrogated *Roberts* with respect to out-of-court statements that are "testimonial" in nature. *Crawford*, 124 S.Ct. at 1374. The court explained:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

*Id.* Thus, under *Crawford*, the admission of testimonial hearsay violates the Confrontation Clause unless the declarant is shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.*

The *Crawford* court declined to provide a comprehensive definition of "testimonial," although it did note three formulations of core testimonial evidence: (1) "ex parte in-court testimony or its functional equiva-lent," such as affidavits, custodial examinations, prior trial testimony not subject to cross-examination, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 1364. The court further noted that "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 1374. With respect to police interrogations, the court noted that it used "the term 'interrogation' in its colloquial rather than any technical legal, sense." *Id.* at 1365 n. 4.

In this case, however, we need not resolve whether Maria's statements to the police were testimonial because Gonzalez forfeited his right of confrontation under the doctrine of forfeiture by wrongdoing.[4] In *Crawford*, the court stated that it

---

4. We seriously question whether the statements Maria made to the investigating officers can be classified as "testimonial" statements under *Crawford*. It appears that testimonial statements under *Crawford* have an official and formal quality about them. Here, Maria's statements were not given in a formal setting; given during any type of pretrial hearing or deposition; contained within a formalized document of any kind; or made under circumstances which would lead an objective person to reasonably believe that the statement would be available for use at a later trial. *See Samarron v. State*, 150 S.W.3d 701, 705–07 (Tex.App.-San Antonio 2004, no pet. h.) (holding witness's formal, signed, written statement given at the police station one hour after the crime following structured police questioning was testimonial). Admittedly, Maria gave her statement in direct response to police questioning. Officers asked Maria what had happened and Maria responded that she had been shot, gave a physical description of the shooter, and gave a location where the shooter might be found. Although the interaction between Maria and the officers occurred during the course of the officers' "official" duties, we are not convinced that investigatory questioning immediately after a crime has been committed rises to the level of an "interrogation." An unstructured interaction between an officer and witness shortly after a distressing event has occurred, like that which occurred here, simply does not fit within a lay conception of "interrogation." *See Crawford*, 124 S.Ct. at 1365 n. 4. Thus, it is unlikely that Maria's statements would be consid-

would continue to recognize the doctrine of forfeiture by wrongdoing, which "extinguishes confrontation claims on essentially equitable grounds." *Id.* at 1370. As the Supreme Court explained more than a hundred years ago:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own [the accused's] wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

*Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1879). Thus, the doctrine of forfeiture by wrongdoing "embraces the equitable principle that a defendant who has rendered a witness unavailable for cross-examination through a criminal act ... may not object to the introduction of hearsay statements by the witness on Confrontation Clause

grounds." *People v. Giles,* 123 Cal. App.4th 475, 19 Cal.Rptr.3d 843, 847 (2004). In light of this doctrine, we hold that Gonzalez is precluded from objecting to the introduction of Maria's statements on Confrontation Clause grounds because it was his own criminal conduct (in this case, murder) that rendered Maria unavailable for cross-examination.[5]

■ Gonzalez argues that a defendant forfeits a Confrontation Clause objection through wrongdoing only when he is charged with or is under investigation for a crime, and wrongfully procures the witness's absence from trial with the intent of preventing the witness from testifying about that crime. *See United States v. Houlihan,* 92 F.3d 1271, 1279–80 (1st Cir. 1996) (describing the doctrine of forfeiture by wrongdoing as applying when the defendant causes a potential witness's unavailability by a wrongful act undertaken with the intention of preventing the potential witness from testifying at a future trial). Gonzalez asserts that because there is no evidence he shot Maria with the intention of preventing her testimony at a future trial, the doctrine of forfeiture by wrongdoing does not apply. Although *United States v. Houlihan* suggests that the procurement of the witness's absence must be motivated by a desire to silence the victim for the forfeiture by wrongdoing

ered testimonial and, therefore, precluded by *Crawford's* Confrontation Clause analysis.

**5.** *See id.* We believe it is of no consequence in this case that the issue of forfeiture by wrongdoing was not litigated below. An evidentiary ruling, such as the one admitting Maria's out-of-court statements, will be upheld on appeal if it is correct on any theory of law that finds support in the evidence. *Bee v. State,* 974 S.W.2d 184, 190 (Tex.App.-San Antonio 1998, no pet.). In future cases, we encourage the trial courts to consider the forfeiture issue at the time they are confront-

ed with a Confrontation Clause objection. When making its forfeiture determination, a court should consider the evidence admitted up to that point in the proceeding and, if necessary, hold a hearing outside the presence of the jury to take additional evidence. If there is sufficient evidence to demonstrate forfeiture, the court should admit the evidence over the defendant's objection and set forth on the record its factual findings that support a forfeiture to allow for a meaningful appellate review of the forfeiture issue.

doctrine to apply, we see no reason why the doctrine should be limited to such cases. *See Giles*, 19 Cal.Rptr.3d at 848. A defendant whose wrongful act renders a witness unavailable for trial benefits from his conduct if he can use the witness's unavailability to exclude otherwise admissible hearsay statements. This is true whether or not the defendant specifically intended to prevent the witness from testifying at the time he committed the act that rendered the witness unavailable.[6] Gonzalez's first issue is therefore overruled.

### JURY CHARGE ON LESSER INCLUDED OFFENSE

█ Gonzalez also complains that the trial court erred in failing to instruct the jury on a lesser included offense. The trial court's charge instructed the jury on capital murder and on the lesser included offense of aggravated robbery, but did not include Gonzalez's requested instruction on the unauthorized use of a motor vehicle, which may be a lesser included offense of aggravated robbery. *See Johnson v. State*, 84 S.W.3d 726, 730 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). Because the court failed to include an instruction on the unauthorized use of a motor vehicle, Gonzalez contends the trial court committed reversible error. We disagree.

█ When reviewing charge errors, an appellate court undertakes a two-step review: first, the court must determine whether error actually exists in the charge; second, if the court finds error, it must determine whether sufficient harm resulted from the error to require reversal. *Almanza v. State*, 686 S.W.2d 157,

171 (Tex.Crim.App.1984). When, as here, there has been a timely objection made at trial, an appellate court will reverse only if "the error is not harmless." *Id.* In determining the degree of harm, we look to the entire jury charge, the state of the evidence, the arguments of counsel, and any other relevant information revealed by the record. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App.1996).

█ To determine whether Gonzalez was entitled to a charge on a lesser included offense, we apply a two-prong test. *Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim.App.2002). First, the lesser included offense must be included within the proof necessary to establish the offense charged. *Id.* Second, some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Id.* "In other words, there must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense." *Id.* at 750–51. The record evidence "must establish the lesser-included offense as a valid rational alternative to the charged offense." *Id.* at 751.

Although unauthorized use of a motor vehicle may be a lesser included offense of aggravated robbery, *see Johnson*, 84 S.W.3d at 730, we do not believe there is any evidence in the record that would permit a rational jury to find that if Gonzalez is guilty, he is guilty only of unauthorized use of a motor vehicle. The record reveals that before the murders, Alex Aguilar ob-

---

6. Several courts have applied the forfeiture by wrongdoing doctrine in cases where the defendant is charged with the same homicide that rendered the witness unavailable. *See Giles*, 19 Cal.Rptr.3d at 851 (holding that if the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable); *People v. Moore*, No. 01CA1760, —— P.3d ——, ——, 2004 WL 1690247, *4 (Colo.Ct.App. Jul.29, 2004) (same); *State v. Meeks*, 277 Kan. 609, 88 P.3d 789, 794 (Kan.2004) (same).

served Gonzalez and another person standing outside of the Herreras' residence. Sometime thereafter, the Herreras were shot. When officers arrived at the scene of the crime, Maria Herrera gave the officers a description of her assailant and told them that the assailant stole her truck. Authorities located Maria's stolen vehicle being driven by an individual fitting the description given by Maria. After authorities stopped the individual (Gonzalez) authorities found property belonging to the Herreras on his person. In addition, authorities discovered Maria's blood on Gonzalez's sneakers. Based on the testimony, we cannot say that the record contains evidence that would permit the jury to conclude Gonzalez is guilty only of unauthorized use of a motor vehicle.

■ Nevertheless, even if we were to assume Gonzalez was entitled to an instruction on the unauthorized use of a motor vehicle, the trial court's failure to give the jury the requested instruction did not harm Gonzalez. When the jury found that Gonzalez was guilty of the greater offense of capital murder, the jury necessarily rejected the theory that Gonzalez was guilty, if at all, solely of the lesser included offense of aggravated robbery. Because unauthorized use of a motor vehicle is a lesser included offense of aggravated robbery, the jury would necessarily have rejected the theory that Gonzalez was guilty, if at all, solely of the lesser included offense of unauthorized use of a motor vehicle. Conversely, if the jury had believed Gonzalez was guilty only of unauthorized use of a motor vehicle, it would most likely not have convicted Gonzalez of capital murder when it had the option of convicting Gonzalez of aggravated robbery. Under the facts of this case, Gonzalez was not harmed by the trial court's failure to include a jury charge on the lesser included offense of unauthorized use of a motor

vehicle. Gonzalez's second issue is therefore overruled. *See Saunders v. State*, 913 S.W.2d 564, 572 (Tex.Crim.App.1995).

### CONCLUSION

Based of the foregoing, we affirm the trial court's judgment.