COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

§

BOBBY EARL WOODS,                                        No. 08-07-00203-CR

§

       Appellant,                                        Appeal from

§

v.                                                                 Criminal District Court No. 4

§

THE STATE OF TEXAS,                                     of Tarrant County, Texas

§

       Appellee.                                         (TC # 1065323R)

§

## **O P I N I O N**

Bobby Earl Woods appeals his murder conviction in a case that could have been scripted for NBC's drama series, *Cold Case*. A jury found Appellant guilty and assessed his punishment at imprisonment for fifty years. For the reasons that follow, we affirm.

## **FACTUAL SUMMARY**

On June 9, 1990, the body of Jane Thompson, a single mother of two, was found under a pile of debris on the east side of Fort Worth, in an undeveloped and wooded area just off of Sartain Drive. There was a blood stain in the street and a trail of blood leading toward the body. Thompson died as the result of blunt force trauma to the back of her head. Her injuries were consistent with having been struck with the butt of a shotgun. At the time her body was discovered, Thompson had been missing several days. The police investigated the murder and considered Appellant a suspect, but they did not arrest him until the case was re-opened sixteen years later.

Thompson had lived with her two sons, 14-year-old Vol, and 2 ½-year-old Josh. Appellant is Josh's father. Thompson had ended her romantic relationship with Appellant three months prior to her death and he had moved out of her apartment. But she continued to have contact with him

because of their son and because she relied on Appellant for transportation since she didn't drive.

Larry Moore worked as the general maintenance man at the apartment complex where Thompson and the children lived. He knew Appellant had moved out of Thompson's apartment a few months earlier. A month before her death, Thompson told Moore that she had been trying to break away from Appellant, but he had threatened that if he could not have her, then nobody could. On the day she disappeared, Thompson told Moore that she was going with Appellant to get food stamps. He saw Thompson and Josh leave with Appellant in his tan and gold Pontiac. He recalled they left at 5:30 p.m. and Moore left for home shortly thereafter. Moore gave police a written statement and portions of it were admitted at trial as a recorded recollection.

Thompson disappeared on Vol's last day of school. She had told him to take the bus and wait for her at his grandmother's house because she planned to take him somewhere special. Vol missed the bus and was late arriving at his grandmother's house. He was not concerned at first, and he fixed something to eat and watched television for awhile. His grandparents came home at around 8 p.m., but Thompson still had not arrived. The family knew something was wrong because Thompson was extremely punctual and it was not like her to leave Vol at his grandmother's house without calling. Later that evening, Appellant brought Josh to the house and announced that Thompson was missing. He did not stay long.

LaVonda Drake had been friends with Thompson for several years and they lived in the same apartment complex. A few days before Thompson vanished, Drake saw Appellant's car parked near the complex but out of view from Thompson's door. Appellant sat on the hood of his car and watched for hours even though it was hot. On the day Thompson went missing, Drake had just put her children to bed at around 9 p.m. when Appellant knocked loudly on her door. He appeared nervous and was wringing his hands. He told her he had taken Thompson to get food stamps and

left to get gas.  When he returned, Thompson was gone.  Drake doubted his story because she knew there was a gas station right across the street from the food stamp office.  Drake offered to go with him to search for Thompson, but he refused her help.  Drake noticed that Appellant was in a small red car instead of the one he usually drove.  When she saw Josh in the front seat, she offered to keep him until Thompson returned home.  Appellant refused that offer as well.  Drake asked what Thompson had been wearing and Appellant left quickly after describing her clothing.  Drake knew that Thompson did not usually leave Josh with anyone.  Concerned and uneasy, Drake called Thompson's mother and spoke to Gwen Diggs, Thompson's sister.  She told Diggs about her conversation with Appellant and that she felt something was wrong.

Diggs found out that Thompson was missing when Vol called that evening and asked if she had seen her.  She told him she had not.  After speaking with her mother, Diggs went over to the house.  When she arrived, she saw Appellant sitting outside in his car.  He got out of his car to talk to her, but Diggs did not want to speak with him and went straight inside.  Appellant remained outside for a while.  The family called the police and searched for Thompson themselves that evening.

The next morning, Thompson's sisters spoke with Josh about what had happened the day before and asked him if he had seen his mother.  He said, "My mama is hurt, my mama is hurting." Diggs asked Josh where his mother was and he said, "My daddy hit my mother."  He also said that his mother was running and saying "Oh Lord, oh Lord, help me."  Diggs asked him what was wrong with her and Josh imitated how his mother was limping.  He then said, "He shoot my mama, he shoot my mama." Upon hearing this, the family took Josh to the police station where he was interviewed.

Josh was nineteen at the time of trial.  He testified about his memories of the day his mother was hurt.  He recalled that someone took him out of the car and placed him on the ground.  His

mother was also on the ground and he saw Appellant hitting her in the head with something in his hand. He next remembered being placed in the car and he looked out the window and saw his mother covered with leaves and sticks. When his father got in the car, Josh asked where his mother was and Appellant told him that she was fine. Josh recalled there was a purse on his lap and it had blood on it. The next thing Josh remembered was being at his grandmother's house.

Detective Phillip Roe worked homicide in 1990 and he was given a missing person's report on the afternoon of June 6, 1990. Roe spoke with Appellant on June 7 and took his written statement. Appellant said he spoke to Thompson on June 5 about their work schedules because she was having trouble getting to work. Appellant went to pick up Josh from day care that afternoon, but Thompson had already picked him up. He went to her apartment and Thompson said she needed food stamps. Appellant, Thompson, and Josh got in Appellant's car and headed for the check-cashing place on Seminary Drive. As they pulled into the parking lot, Thompson saw someone she knew. She then went inside the check-cashing place while Appellant and Josh left to get gas and go to Pep Boys. When they returned eight to ten minutes later, Thompson was gone. Appellant looked around the area for her but couldn't find her. He drove to her apartment and talked to her neighbors. He also went to Drake's apartment and talked to her. At the time he gave the statement, Appellant had an injury to his hand but he explained that he had injured it at work on the day Thompson went missing.

As part of his investigation in 1990, Detective Roe went to the check-cashing and food stamp office where Thompson supposedly had gone. He reviewed the office records and could find nothing to indicate Thompson had been there on June 5. Roe spoke with Appellant again after Thompson's body was found and Appellant denied killing her. On June 14, 1990, Detective Roe was contacted by the creditor who owned the note on Appellant's tan and brown Pontiac because they were trying

to locate the vehicle.

Appellant's nephew, Tony Pratt, was also questioned in 1990. When Thompson told Appellant to move out of her apartment, he moved in with Pratt and Pratt's mother. Pratt explained that Appellant was addicted to crack cocaine. Pratt sold it to support his own drug habits. Pratt accompanied Appellant when he broke into Thompson's apartment shortly before her death. They ate food from her refrigerator and took a Playstation and a television. The day before Thompson went missing, Appellant told Pratt that Thompson had some money but she refused to give him any. He recalled that on the day Thompson disappeared, she had been to his apartment with Appellant and Josh. They appeared angry and were not speaking to one another. They left for the food stamp office but Appellant returned an hour or so later saying she was missing. Pratt noticed that Appellant was nervous and his clothes were all wrinkled and "messed up" which is not how he had looked earlier in the evening. Appellant had money when he returned. Appellant told Pratt that he was going to take Josh to his grandmother's house. The next time Pratt saw Appellant, he was in the parking lot of the apartment complex. Appellant was "spaced out in his own world" but not like he was high. Appellant talked about Thompson as if he would never see her again. He also kept mumbling the word "Spartain." Later that evening, Thompson's brother came to the apartment complex and accused Appellant of killing Thompson. The police were called and the brother left. After everything calmed down, Appellant told Pratt that he had taken Thompson to a field and told her he saw a rabbit. He got the shotgun out of the trunk, told Thompson to turn around, and hit her in the head with the shotgun. Appellant said Thompson urinated on herself and was moaning. Pratt knew that Appellant had a sawed-off shotgun which he kept in the trunk of his car.[1] Appellant told

_____

[1] Detective Pat Fritz also interviewed Appellant on June 16, 1990 as part of an investigation. He told Fritz he had a sawed-off shotgun but said that last time he saw the gun was June 3, 1990.

Pratt that Josh was with him when he killed Thompson. Pratt did not tell the police in 1990 about this confession because Appellant was his uncle and he did not want him to go to jail. Pratt explained that he had revealed this information to the police more recently because it had been on his conscience. He also admitted he was more willing to testify about all of these events after the prosecutor explained to him that he could not be prosecuted for the drug dealing and burglary he had committed in 1990 because the statute of limitations for those offenses had expired.

Detective Manny Reyes, who is assigned to the cold case unit, interviewed Pratt in 2006 after the case was re-opened. Reyes obtained an arrest warrant for Appellant, who subsequently gave Reyes a statement which deviated significantly from the statement he had made in 1990. This time, Appellant claimed that Thompson went into a fashion boutique and he had gone to Dairy Queen and Pep Boys. He told Reyes he returned after about an hour. Appellant also told Reyes that someone told him Thompson had gotten in a car with two guys. Appellant claimed he had made a missing person's report from a payphone on Seminary, but the police department's records did not show he had made a report. The report came from the residence of Thompson's mother.

Appellant testified in his own defense. He admitted the statement he gave to Detective Reyes in 2006 was false. He fabricated the statement because he was afraid and because he did not remember having given a statement in 1990. Consistent with his 1990 statement, Appellant testified he took Thompson to get food stamps and he dropped her off while he went to get gas and to Pep Boys. When he returned, Thompson was not there. He went inside the check-cashing store and drove around the area looking for her. Appellant denied killing Thompson and he also denied telling Pratt he had killed her. He denied being addicted to crack cocaine or even using it. On cross-examination, Appellant took issue with the prosecutor's characterization of his 2006 statement as a lie and said it was the truth "in [his] mind at that time." But he admitted that if he had been given

a chance to read his 1990 statement, his 2006 statement would have conformed to it.

During rebuttal, the State offered the testimony of Cheryl Carey Gregg. Appellant and Gregg have a twelve-year-old daughter and lived together for about a year and a half. During the time she knew Appellant, he used crack cocaine daily and was addicted to it. On a few occasions when they argued, Appellant told Gregg that he had a wife who had been killed and they never found the killer. Gregg took this statement as a threat.

## ADMISSION OF WRITTEN STATEMENT

In Issue One, Appellant contends that the trial court erred by admitting Larry Moore's written statement. He offers two reasons why the statement should have been excluded: (1) the State failed to lay the proper predicate under Texas Rule of Evidence 803(5); and (2) the written statement included double-hearsay or "hearsay within hearsay."

### Preservation of Error

The State specifically offered Moore's statement as a recorded recollection pursuant to the Texas Rules of Evidence. Appellant made several objections to the contents of the written statement, but he did not object that the State had failed to lay the proper predicate under Rule 803(5). This argument is waived. *See* TEX.R.APP.P. 33.1(a)(1).

### Hearsay within Hearsay

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex.Crim.App. 2005); *Whipple v. State*, 281 S.W.3d 482, (Tex.App.--El Paso 2008, pet. ref'd). We will not disturb the trial court's judgment unless it falls outside the zone of reasonable disagreement. *Apolinar*, 155 S.W.3d at 186. Hearsay statements are generally inadmissible unless the statement falls within a recognized exception to the hearsay rule. *Walters v. State*, 247 S.W.3d 204, 217 (Tex.Crim.App. 2007); TEX.R.EVID. 802. Hearsay included

within hearsay is not excluded if each portion of the combined statement falls within an exception to the hearsay rule. TEX.R.EVID. 805.

Appellant raised a hearsay objection to the following portion of Moore's written statement:

About a month ago, Jane Thompson told me that she was still trying to break away from Bobby Woods and that Bobby told her that if he could not have her, then nobody could have her.

In examining the admissibility of this statement, we will consider: (1) Thompson's statement that she was trying to break away from Appellant, and (2) Appellant's statement that if he could not have Thompson, then no one could. Both parts of this statement are hearsay because they were offered to prove the truth of the matter asserted, namely, that Thompson had ended her romantic relationship with Appellant and Appellant had made a threat against Thompson because the relationship had ended. *See* TEX.R.EVID. 801(d). The State does not argue that this statement falls within any exception to the hearsay rule. Instead, the State contends that Thompson's statement is admissible because Appellant waived his right of confrontation by killing her. The State cites *Gonzalez v. State*, 195 S.W.3d 114, 115 (Tex.Crim.App. 2006) in support of this argument. There, the Court of Criminal Appeals considered whether the admission of the dying victim's statement describing her assailant violated the defendant's constitutional right to confrontation. *Id.* The statements had been admitted over the defendant's hearsay and confrontation clause objections. The San Antonio Court of Appeals held that the victim's statements were excited utterances. *Gonzalez v. State*, 155 S.W.3d 603, 610 (Tex.App.--San Antonio 2004). It also held that the defendant had waived his right to confrontation under the doctrine of forfeiture by wrongdoing. *Id.* Following an extensive analysis of the doctrine, the Court of Criminal Appeals affirmed because the record supported a conclusion that the victim's murder was motivated at least in part by the defendant's desire to permanently silence her and prevent her from identifying him. *Gonzalez*, 195 S.W.3d at 125-26.

The State's reliance on *Gonzalez* is misplaced because it does not stand for the proposition that the forfeiture-by-wrongdoing doctrine is an exception to the hearsay rule. It applies to an objection based on a confrontation clause violation. Accordingly, we find that the trial court abused its discretion by overruling Appellant's hearsay objection to this portion of Moore's statement.

The erroneous admission of hearsay is not of constitutional dimension. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex.Crim.App. 2008). Thus, the appropriate harm analysis is set out in Rule 44.2(b) of the Texas Rules of Appellate Procedure, which dictates that a non-constitutional error "that does not affect substantial rights must be disregarded." *Taylor*, 268 S.W.3d at 592. Under this standard, error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict. *Id.* In conducting the harm analysis, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the State's theory, any defensive theories, closing arguments, and even voir dire if material to the appellant's claim. *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex.Crim.App. 2002). The factors to be considered are the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Id.*; *Morales*, 32 S.W.3d 862, 867 (Tex.Crim.App. 2000). The weight of the evidence of appellant's guilt is also relevant. *Motilla*, 78 S.W.3d at 359-60. Moreover, improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex.Crim.App. 1999)(holding that any error in admitting hearsay evidence was harmless in light of other properly admitted evidence proving the same fact). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the finder of fact, or had but a slight

effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex.Crim.App. 2001).

Admission of the first part of the hearsay statement is harmless because other witnesses testified that Thompson had ended her romantic relationship with Appellant. *See Nixon v. State*, 940 S.W.2d 687, 690 (Tex.App.--El Paso 1996, pet. ref'd)(admission of hearsay evidence is harmless when the same or similar evidence is admitted). The second portion of the statement indicated one possible motive for the murder of Thompson, that is, Appellant's desire to possess her, but other evidence supported a different motive for the murder, namely, Appellant's need for money to support his addiction to crack cocaine. At any rate, the State did not refer to the inadmissible hearsay testimony in final argument but instead focused on Josh's testimony, the contradictory stories told by Appellant, and Appellant's confession to Pratt. Given the strength of that evidence and the arguments relied on by the State, we are unpersuaded that the hearsay statement had a substantial and injurious effect on or influenced the jury's verdict. We overrule Issue One.

### ADMISSION OF JOSH'S STATEMENTS TO HIS AUNT

In Issue Two, Appellant challenges the admission of Diggs' testimony relating what Josh told her the morning after Thompson disappeared. The trial court overruled Appellant's hearsay objection. On appeal, the State contends the evidence is admissible under Rule of Evidence 803(1) as a present sense impression.

A present sense impression is a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. TEX.R.EVID. 803(1). It is undisputed that Josh made the statements the following morning in response to questioning by his aunts. This does not satisfy Rule 803(1)'s requirement that the statement have been made at the time the declarant was perceiving the event or immediately thereafter.

The State also maintains that Diggs' testimony was not hearsay because it was a prior consistent statement offered to rebut an express or implied charge of recent fabrication, improper influence, or motive. TEX.R.EVID. 801(e)(1)(B); *see Hammons v. State*, 239 S.W.3d 798, 804 (Tex.Crim.App. 2007). Appellant challenged Josh's credibility throughout the trial and sought to establish through more than one family member that Thompson's murder and the family's suspicions about Appellant's culpability had been regularly discussed at family gatherings over the years. The implication of this attack was clear even before Josh testified: Josh's present memories about the event were recently fabricated and had been influenced by the family in the intervening years. The record reflects that Josh's statements were consistent with his trial testimony and were made prior to the time that the supposed improper influence or motive to falsify arose. As such, the statements were not hearsay and were admissible under Rule 801(e)(1)(B). Because the trial court did not abuse its discretion by overruling Appellant's hearsay objection, we overrule Issue Two.

**EXTRANEOUS OFFENSE**

In Issue Three, Appellant argues the trial court erred by admitting extraneous offense evidence that Appellant burglarized the victim's apartment. As a rule, an accused may not be tried for some collateral crime or for being a criminal generally. TEX.R.EVID. 404(b); *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App. 1983). In the face of a proper objection, evidence of other wrongful acts is not admissible to prove the character of the person to establish that he acted accordingly regarding the alleged offense. *Powell v. State*, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001). An extraneous offense may be admissible, however, if it has relevance apart from its tendency to prove the character of a person in order to show that he acted in conformity therewith. *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Crim.App. 1990); *Lazcano v. State*, 836 S.W.2d 654, 657 (Tex.App.--El Paso 1992, pet. ref'd). Evidence which logically serves such purposes as

"proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" is relevant beyond its tendency to prove conforming character. *Montgomery*, 810 S.W.2d at 387; *Lazcano*, 836 S.W.2d at 657; TEX.R.EVID. 404(b). In a murder prosecution, evidence relating to the previous relationship between the defendant and the deceased is admissible, as is evidence relating to the condition of the defendant's mind at the time of the offense. TEX.CODE CRIM.PROC.ANN. art. 38.36(a)(Vernon 2005). The nature of the relationship--such as whether the victim and the accused were friends, were co-workers, were married, estranged, separated, or divorcing--is clearly admissible under this article. *Garcia v. State*, 201 S.W.3d 695, 702 (Tex.Crim.App. 2006).

The State offered evidence at trial that Thompson had ended her romantic relationship with Appellant and that he had not been living in Thompson's apartment for at least a month prior to her death. Other evidence showed that her apartment had been burglarized about a month before her death. Pratt testified over objection that he and Appellant had committed the burglary and had taken electronics. Appellant had attempted to portray his relationship with Thompson as amiable and supportive. His commission of this offense rebuts that idea and illuminates the true nature of their relationship. The burglary evidence is relevant to show Appellant's state of mind at the time of the offense when it is considered with Pratt's testimony that the day before the murder Appellant was unhappy that Thompson had money but would not give him any. The burglary evidence is also relevant to a possible motive for the murder, that is, obtaining money to support Appellant's crack cocaine addiction. The trial court did not abuse its discretion by admitting the burglary evidence. We overrule Issue Three and affirm the judgment of the trial court.

November 12, 2009

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)